T.C. Memo. 1998-31


UNITED STATES TAX COURT


RONALD D. CIARAVELLA, Petitioner v. COMMISSIONER
OF INTERNAL REVENUE, Respondent

ICARUS, INCORPORATED, Petitioner v. COMMISSIONER
OF INTERNAL REVENUE, Respondent


Docket Nos. 9650-96, 9651-96.          Filed January 26, 1998.


Russell S. Koss, for petitioners.

Willie Fortenberry, Jr., for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

BEGHE, Judge:  In these consolidated cases, respondent determined the following deficiencies and penalty with respect to petitioners' Federal income taxes:

### Ronald D. Ciaravella

| Year Ended | Deficiency | Accuracy-Related Penalty Sec. 6662(a) |
|---|---|---|
| 12/31/92 | [1]-0- | -0- |
| 12/31/93 | $39,512 | $7,902 |

[1] Respondent's disallowance of deductions for trade or business expenses claimed by Mr. Ciaravella in connection with race car activities would not result in taxable income for 1992 but would eliminate the net operating loss carryover from 1992 that Mr. Ciaravella claimed on his 1993 income tax return.

### Icarus, Inc.

| Year Ended | Deficiency |
|---|---|
| 8/31/91 | $10,210 |
| 8/31/92 | 5,546 |
| 8/31/93 | 15,002 |

All section references are to the Internal Revenue Code as in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions,[1] the issues for decision are as follows:

(1) Whether and to what extent Icarus, Inc. (Icarus) is entitled to deduct expenditures related to race car activities in computing the taxable income shown on its consolidated returns for fiscal years ended August 31, 1991, 1992, and 1993.

---

[1] Respondent concedes that Icarus, Inc., is entitled to deduct $11,644 of the $91,644 claimed as advertising expenses for FYE Aug. 31, 1993. Respondent also concedes that Mr. Ciaravella is entitled to IRA deductions of $2,000 for each of the years 1992 and 1993. Any adjustments to petitioners' deficiencies and penalty by reason of the foregoing concessions would be made in the Rule 155 computations.

(2) Whether and to what extent, for the calendar years 1992 and 1993, gross receipts of Ronald D. Ciaravella (Mr. Ciaravella) in the name of his sole proprietorship, Innovative Advertising (Innovative), are includable in his gross income as constructive dividends received from Icarus.

(3) Whether Mr. Ciaravella is entitled to deductions for expenditures claimed as business expenses on the Innovative Schedules C for the years 1992 and 1993.

(4) Whether Mr. Ciaravella is liable for the accuracy-related penalty under section 6662(a) for 1993 due to negligence or disregard of rules or regulations.

We disallow part of the race car expenditures claimed as deductions by Icarus, but hold that no amounts paid to Mr. Ciaravella through Innovative are includable in Mr. Ciaravella's income as constructive dividends. We further hold that Mr. Ciaravella is not entitled to deduct business expenses on the Innovative Schedules C, thereby disallowing the net losses claimed thereon. Finally, we hold that Mr. Ciaravella is liable for the accuracy-related penalty for 1993 in an amount equal to 20 percent of the underpayment to be determined under a Rule 155 computation.

## FINDINGS OF FACT

Some of the facts have been stipulated and are incorporated herein by this reference.

Sarasota, Florida, was Mr. Ciaravella's residence and Icarus' principal place of business at the respective times they filed their petitions.

Mr. Ciaravella is a calendar year taxpayer and the sole shareholder of Icarus, a domestic corporation that filed consolidated U.S. corporation income tax returns with its wholly owned subsidiary, Dolphin Aviation, Inc. (Dolphin), on the basis of a fiscal year ending August 31.

Icarus functions as the holding company for Dolphin, which is a fixed-base operator of a general aviation facility at the Sarasota/Bradenton International Airport. Dolphin leases 17 acres of land from the airport but owns all the improvements on the land, including hangars, fuel farms, ramp areas, and office space. Dolphin rents office space to aviation-related entities, such as aircraft brokers and an aircraft sales company, provides helicopter storage space for the Manatee County Sheriff's Department, and rents hangar space for occupancy by private and company-owned aircraft.

In its day-to-day operations, Dolphin provides transient services, such as the sale of jet fuel, catering services, the sale of airplane parts, and general maintenance and repair work for aircraft flying into and out of the airport. Dolphin also sells and leases aircraft, including selling used Learjets at prices ranging from $200,000 to close to $2,000,000. The Learjet is the DC-3 of the jet age, and its resale values have increased

over time.  Dolphin purchases used Learjets, many of which are 20 and 30 years old, replaces the engines, rehabilitates, repairs, and paints them, and then leases them to corporations and individuals.  Between leases, Dolphin tries to sell the jets.

Sarasota Jet Center, Inc. (Sarasota), and Nomad Distributors Intl., Inc. (Nomad), are corporations that are also directly or indirectly owned or controlled by Mr. Ciaravella.  They are members of a controlled group of corporations, within the meaning of section 1563(a), which includes Icarus and Dolphin, but are not included on the Icarus consolidated return because they are not members of the Icarus affiliated group within the meaning of section 1504(a).  Sarasota and Nomad also sell aircraft and at times buy aircraft from Dolphin and then sell them to third parties.

The following are the yearend cost balances of aircraft owned by Dolphin[2] and held for sale or lease:

| FYE 1991 | FYE 1992 | FYE 1993 |
|----------|----------|----------|
| $2,958,000 | $2,668,000 | $3,893,000 |

---

[2] The Court requested the parties to provide posttrial information as to the yearend inventory balances of aircraft owned by Dolphin.  Petitioner submitted inventory balances for aircraft owned by Dolphin and other corporations that are directly or indirectly owned by Mr. Ciaravella.  Our findings concerning the yearend inventory balances are based on the costs of the aircraft that petitioner has proven belonged to Dolphin during the years in issue.

The following are the cost balances for aircraft owned by the entire controlled group of corporations, including Dolphin, Nomad, and Sarasota:

| FYE 1991 | FYE 1992 | FYE 1993 |
|----------|----------|----------|
| $7,178,808 | $7,014,710 | $8,352,710 |

During the fiscal years beginning September 1, 1991, and ending August 31, 1996, Dolphin sold the following aircraft at prices that resulted in $5,304,000 of gross sales:

| Purchase Date | Sale Date | Manufacture Date | Aircraft | Buyer | Price |
|---------------|-----------|------------------|----------|-------|-------|
| 03/31/92 | 06/22/92 | 1965 | Lear 24 | Florida Broadcast Management, Inc. | $210,000 |
| 05/23/88 | 06/25/92 | 1965 | Lear 24 | Sarasota Jet Center, Inc. | 230,000 |
| 02/05/93 | 02/05/93 | 1979 | Piper Aerostar | Florida Broadcast Management, Inc. | 150,000 |
| 05/16/88 | 10/01/93 | 1979 | Nomad N24 | Nomad Distributors Intl. Inc. | 690,000 |
| 05/25/88 | 06/29/94 | 1978 | Lear 35 | Samaritan Air Ontario, Canada | 1,330,000 |
| Unknown | 08/26/94 | 1980 | Nomad N22 | International Jet Center - Miami, FL | 300,000 |
| 08/22/90 | 10/28/94 | 1980 | Piper Saratoga | Richard Taller Wheeling, FL | 82,000 |
| 01/02/95 | 04/12/95 | 1980 | Cessna C172 | Robert Kilby - VA | 37,000 |
| 01/02/95 | 06/23/95 | 1980 | Piper Seneca | U.S. Aviation Group, Inc. - Sarasota, FL | 75,000 |
| 02/23/94 | 01/23/96 | 1966 | Lear 24 | Younkin & Boreing, Inc. - Dover, DE | 275,000 |
| 08/27/93 | 08/14/96 | 1980 | Lear 35 | Valley Construction, Inc. - Las Vegas, NV | 1,925,000 |

Selling aircraft is a high-profit-margin part of Dolphin's business. For the fiscal years ending August 31, 1992 and 1993, approximately 30 percent of Dolphin's gross receipts came from aircraft sales and leases.

Mr. Ciaravella is the chief executive officer and sales manager of Dolphin, overseeing its general operations and playing the primary role in the marketing of Dolphin's products and services, including sales and leases of airplanes. Mr. Ciaravella has been flying since 1969, when he was age 17 and started working for the previous owners of Dolphin. In time he bought the business from them. Unlike some aircraft salesmen, Mr. Ciaravella can actually fly the aircraft he markets; he has more than 9,000 hours of flying time, including about 1,000 hours in Learjets.

Dolphin used to be a distributor for Piper aircraft and would sell propeller-driven aircraft made by Piper, Beechcraft, and Cessna until the mid-1980's when those companies went out of business. Mr. Ciaravella began to purchase Learjets in an effort to reinvigorate the aircraft sales and leasing portion of Dolphin's business. Used Learjets are at the low end of the price scale for commercial grade jet aircraft.

In 1988, Mr. Ciaravella went to three different schools to learn how to drive high-performance, open-wheeled race cars. Open-wheeled race cars have large tires, uncovered by fenders, and they are much more difficult to drive than stock cars and

sports cars.  Unlike stock cars and sports cars, open-wheeled cars cannot be driven on public roads.

Since 1989, Mr. Ciaravella has owned an open-wheeled race car, which he drives five or six times a year in races on a national circuit sponsored by Merrill Lynch and Rolex.  No prize money is awarded, only points to determine an overall winner at the end of the racing season.  Mr. Ciaravella usually finishes in the top 5 of a 30-car field.  Mr. Ciaravella thought that racing cars would help him build a dashing, gallant image that would allow him to meet and ingratiate himself with people interested in buying and leasing high performance aircraft, such as Learjets, that he would be marketing.  The market for used aircraft is nationwide, and Mr. Ciaravella believes that racing open-wheeled cars on a national circuit has given him and Dolphin national exposure to potential customers.

During the years at issue, Mr. Ciaravella's race car bore a number of logos.  Most conspicuous was the Dolphin logo, which appeared in large letters on the sides of the car, along with his own name "Ron Ciaravella" in smaller letters.  At a typical race, Mr. Ciaravella's name and the Dolphin name were announced when the race car entered the track.  On the weekend of the race, people would gather in the paddock areas, adjacent to the track, to look over the cars and talk with the drivers.  These races attract a rather upscale crowd, many of whom have an interest in flying.  Mr. Ciaravella has met a number of celebrities and other

prominent figures through his racing activities. As a result of a contact that Mr. Ciaravella made at one of his races, on August 14, 1996, Dolphin sold a Learjet to a Las Vegas construction company for $1,925,000. Mr. Ciaravella claims that his racing activities resulted in other contacts that have led to the sale and lease of aircraft by Dolphin. Dolphin reimbursed Mr. Ciaravella for the bulk of the expenses connected with his racing activities, treating them as advertising expenses.

Mr. Ciaravella's race car also bore the logos of Champion, Checkers, and Valvoline during the years in issue; in return, he received free spark plugs from Champion and free oil from Valvoline. Dolphin has never sponsored or placed its logo on any other race car.

During fiscal periods ending August 31, 1991, August 31, 1992, and August 31, 1993, Dolphin used the following five advertising accounts:[3]

| Account No. | Trade Magazine/Publication/Other |
|---|---|
| 6051 | (a) Trad-A-Plane |
| | (b) Clubhouse |
| | (c) Mcgraw |
| | (d) Trader Publication |
| | (e) Remuo |
| 6052 | (a) Trad-A-Plane |
| | (b) Thurot Tech Aviation |
| | (c) Bham News |

---

[3] It is not clear why five separate accounts are used, nor is it clear why the name of some publications appear in more than one account.

6053          (a) Race Car
                   (b) GTE - Yellow Pages
                   (c) Ac-U-Kwik-Kalatee

6055          (a) Trad-A-Plane
                   (b) MAB/MBC
                   (c) Aviator's Hotline
                   (d) Maxwell

6056          (a) Aviation Directory
                   (b) Select Directory
                   (c) Ac-U-Kwik-Kalatee
                   (d) Air Charter
                   (e) Aopa's USA

The following table sets forth Dolphin's expenditures in connection with each of the advertising accounts listed above:

| Account | FYE 1991 | FYE 1992 | FYE 1993 |
|---------|----------|----------|----------|
| 6051 | $15,439 | $3,736.00 | $3,315.53 |
| 6052 | 3,324 | 1,298.83 | 113.36 |
| 6053 | 67,877 | 47,456.63 | 83,642.95 |
| 6055 | 12,689 | 17,641.26 | 266.58 |
| 6056 | 15,292 | 18,277.34 | 4,305.99 |
| Total | 114,621 | 88,410.06 | 91,644.41 |

Respondent disallowed deductions for Dolphin's advertising expenses in the 6053 account, in the following amounts: (1) $56,250 for fiscal year ending August 31, 1991; (2) $43,321 for fiscal year ending August 31, 1992; and (3) $80,000[4] for fiscal year ending August 31, 1993. All of respondent's disallowances related to the race car expenditures.

---

[4] Originally, respondent disallowed the entire $91,644, but later conceded that $11,644, the portion of advertising expenses not related to the race car, was deductible.

Dolphin reimbursed Mr. Ciaravella for his race car expenditures by making deposits into the checking account of his sole proprietorship, Innovative.  For the years 1992 and 1993, Mr. Ciaravella reported amounts received from Dolphin on the Innovative Schedules C as gross receipts from advertising and also deducted the same amounts as expenses relating to race car activities on the Innovative Schedules C.  He also claimed depreciation deductions on the race car and the trailer used to haul the race car and deducted the costs of replacement parts and maintenance of the car, as well as payments made to Tim Albright, who was responsible for maintaining the race car and was the head of the pit crew at the races.

Dolphin also made payments to Innovative for expenses arising from Dolphin's conventional advertising activities. Trade publications and magazines, in which Dolphin placed advertisements, would send their invoices to Dolphin and correspond directly with Dolphin.  However, payments for the advertising services were made from Innovative's checking account and were deducted by Mr. Ciaravella on the Innovative Schedules C for the years 1992 and 1993.

Mr. Ciaravella reported gross receipts and expenses of Innovative on Schedules C for the years 1992 and 1993 in the following amounts:

|  | Schedule C - Innovative | |
|  | 1992 | 1993 |
| Gross receipts | $59,041 | $114,066 |
| Expenses: | | |
| Advertising[1] | 8,014 | 3,118 |
| Commissions & fees | 550 | -0- |
| Depreciation | 5,775 | [2]15,100 |
| Rental or lease of vehicles, machinery, & equipment | 1,015 | 321 |
| Repairs & maintenance | 37,046 | 86,002 |
| Taxes and licenses | 129 | 811 |
| Travel, meals & entertainment | 3,674 | 5,309 |
| Fuel | 4,619 | 10,702 |
| Other expenses[3] | 2,357 | 2,609 |
| Total expenses | 63,178 | 123,972 |
| Profit (Loss) | (4,137) | (9,906) |

[1]These expenses refer to the payments made by Innovative to trade publications in which Dolphin advertised.

[2]The depreciation deduction was claimed on both the race car and a trailer used to transport the car to race locations. The trailer was purchased in 1993.

[3]Boat fuel expenses relating to the fuel provided by Dolphin to power boats were listed under this category. See infra p. 13.

Respondent disallowed all deductions claimed by Mr. Ciaravella on

the Innovative Schedules C on the ground that the expenses were

not incurred in a trade or business.  Respondent also removed the gross receipts received by Mr. Ciaravella and reported by him on the Innovative Schedules C and recharacterized and included them as constructive dividends.

Although most deposits into Innovative's checking account were made by Dolphin, there were some deposits from other sources.  In August 1992, R.C.I., of Naples, Florida, paid $1,700 for race car parts purchased from Mr. Ciaravella.  In November 1993, the Model Search of Florida paid $2,065.50 to Mr. Ciaravella as compensation for the use of the race car as a prop in a movie production.  In June and July 1993, Mark Pritch, another race car driver, paid $35,000 for the rental of Mr. Ciaravella's trailer and truck and other equipment.

Dolphin also arranged to place its logo on power boats engaged in racing events sponsored by charities.  The boating events averaged 10 races a year, at locations all across the country.  These races also attracted upscale crowds.  In exchange for being allowed to display its logo, Dolphin provided jet fuel to the boat owners when they were in the greater Sarasota area, including St. Petersburg and Tampa.  Mr. Ciaravella deducted the cost of the boat fuel provided by Dolphin on his Innovative Schedules C for his 1992 and 1993 returns.

Mr. Ciaravella's 1993 return was prepared by a Mr. Buchman, who is an employee of I D S Tax and Business Services.  His 1992 return was not signed by a paid preparer.  Vivian Wright,

Dolphin's corporate treasurer, prepared the Icarus consolidated returns for the years in issue.

OPINION

1. Icarus Deductions

Section 162 generally allows a deduction for ordinary and necessary business expenses. Whether an expense is deductible under section 162 is ultimately a question of fact. Commissioner v. Heininger, 320 U.S. 467, 475 (1943). Generally, an expense is ordinary under section 162, if it bears a reasonably proximate relationship to the operation of the taxpayer's business. Deputy v. du Pont, 308 U.S. 488, 495-496 (1940); Gill v. Commissioner, T.C. Memo. 1994-92, affd. without published opinion 76 F.3d 378 (6th Cir. 1996). Generally, an expense is necessary if it is helpful and appropriate in promoting and maintaining the taxpayer's business. Carbine v. Commissioner, 83 T.C. 356, 363 (1984), affd. 777 F.2d 662 (11th Cir. 1985); Gill v. Commissioner, supra.

Even if an expense is ordinary and necessary, it is deductible under section 162 only to the extent it is reasonable in amount. United States v. Haskel Engg. & Supply Co., 380 F.2d 786, 788-789 (9th Cir. 1967); Gill v. Commissioner, supra; Brallier v. Commissioner, T.C. Memo. 1986-42. The element of reasonableness is inherent in the phrase "ordinary and necessary"

in section 162.  Commissioner v. Lincoln Elec. Co., 176 F.2d 815, 817 (6th Cir. 1949).

On its consolidated returns, Icarus deducted as advertising expenses the Dolphin payments made through Innovative to reimburse Mr. Ciaravella for his race car expenditures.  The burden is upon Icarus to prove that Dolphin's race car expenditures were ordinary and necessary to its business of selling and leasing aircraft.  Rule 142(a); Amey & Monge, Inc. v. Commissioner, 808 F.2d 758, 761 (11th Cir. 1987); Gill v. Commissioner, supra; Brallier v. Commissioner, supra.

We find that there is a proximate relationship between the race car expenditures and the Dolphin business.  Mr. Ciaravella's racing activities were well calculated to provide him national exposure that he could take advantage of in his capacity as chief executive and sales manager of Dolphin.  Mr. Ciaravella met a number of celebrities and other prominent people at the races.  These are the types of people who may be interested in buying or leasing the high performance aircraft held by Dolphin and other members of the Icarus controlled group.  Accordingly, we conclude that the expenses are ordinary.

We also find that the racing activity provided benefits to the Dolphin business.  Mr. Ciaravella's name and company were announced at each race.  Spectators saw the Dolphin logo on the sides of the car.  Even if, as respondent contends, the cars were moving too fast during the actual races for the logo to be

noticed, the logo was seen at the start of the races as well as in the paddock areas, where spectators gathered to get a closer look at the cars and provided Mr. Ciaravella with the opportunity to meet and greet potential customers. The fact that Valvoline and Champion compensated Mr. Ciaravella for displaying their logos indicates that the advertising exposure provided by these races did provide its sponsors with some economic benefit. Most importantly, the contacts made at the races during the years in issue were helpful in selling and leasing aircraft, the record indicating at least one highly profitable sale in a later year that resulted from Mr. Ciaravella's racing activities. Accordingly, we conclude that the race car expenses are necessary, in the accepted sense of being helpful.

The connection between racing cars and advertising a business that leases and sells jet aircraft is a stronger connection than the connections put forth by petitioners in Gill v. Commissioner, supra; Boomershine v. Commissioner, T.C. Memo. 1987-384; and Brallier v. Commissioner, supra. Each of the above cases also deals with a corporation that paid the race car expenses of its sole shareholder and claimed deductions for the payments as advertising expenses. In those cases, this Court also found that the expenses were ordinary and necessary but only allowed a portion of the race car expenses to be deducted. The petitioner in Gill raced a stock car to advertise his wholly owned corporation's quilting and stencil business. The

petitioner in <u>Brallier</u> raced a stock car to advertise his wholly owned corporation's pizza restaurant franchise. The petitioner in <u>Boomershine</u> raced a car to advertise his wholly owned corporation that erected metal buildings. The connection between the excitement and appeal of racing cars and owning and flying in high performance jet aircraft is much stronger than the connection between racing cars and selling stencils, pizza, or metal buildings.

Notwithstanding the foregoing, we still do not find that the expenses are entirely reasonable in amount. In determining the extent to which advertising expenses are reasonable, we compare the amount expended for the activity in question with the amount of benefit reasonably expected to be derived. <u>Lang Chevrolet Co. v. Commissioner</u>, T.C. Memo. 1967-212; see also <u>Sanitary Farms Dairy, Inc. v. Commissioner</u>, 25 T.C. 463 (1955); <u>Rodgers Dairy Co. v. Commissioner</u>, 14 T.C. 66 (1950).

We have found that Mr. Ciaravella's racing activities were calculated to help sell and lease aircraft. But the aircraft he was trying to sell were not only owned by Dolphin, but also by Sarasota and Nomad, corporations within the same controlled group as Dolphin, but not included with Dolphin on the Icarus consolidated return. It is axiomatic that in order for an expense to be deductible by a taxpayer, it must be incurred in the taxpayer's own trade or business, not that of another. <u>Columbian Rope Co. v. Commissioner</u>, 42 T.C. 800, 814-816 (1964);

Oxford Dev. Corp. v. Commissioner, T.C. Memo. 1964-182; see also
Interstate Transit Lines v. Commissioner, 319 U.S. 590, 593-594
(1943); Deputy v. du Pont, 308 U.S. at 493-494.

On the basis of the cost balances of aircraft on hand by
Dolphin as compared to the entire controlled group, we find that
the following are the percentages of the total cost of aircraft
of the entire group held for sale and lease which were owned by
Dolphin during the years in issue:

| FYE 1991 | FYE 1992 | FYE 1993 |
|----------|----------|----------|
| 41.2%    | 38.0%    | 46.6%    |

Because Mr. Ciaravella had interests in entities other than
Dolphin that owned aircraft, we are not convinced that the entire
amount spent by Dolphin on race car expenditures reasonably
compares with the benefit that it, as opposed to other members of
the Ciaravella controlled group, could reasonably expect to
derive. When Mr. Ciaravella made contacts at the races, he was
trying to sell and lease aircraft held by Dolphin, Nomad, and
Sarasota, not Dolphin exclusively. Consequently, Dolphin is not
entitled to deduct, on the Icarus consolidated return, the entire
amount of the race car expenses that it paid.

Where a taxpayer establishes his entitlement to a deduction,
but does not establish the amount of that deduction, we are
permitted to estimate the amount allowable, Cohan v.
Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930); Rolland v.
Commissioner, T.C. Memo. 1959-161, affd. 285 F.2d 760 (5th Cir.
1961); Gill v. Commissioner, T.C. Memo. 1994-92; Boomershine v.

Commissioner, supra, provided there is sufficient evidence in the record to provide a rational basis for an estimate, Vanicek v. Commissioner, 85 T.C. 731, 743 (1985).

In Cohan v. Commissioner, supra at 540, the Court recognized that the expenses of an impresario in entertaining actors and crew members were legitimate and deductible. The taxpayer, however, did not produce any of the receipts substantiating such expenses. The Court directed the Board of Tax Appeals to estimate such expenses "bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making".

Although Cohan is a case of substantiation, we, as well as other courts, including the Court of Appeals for the Eleventh Circuit, to which this case would be appealable, have extended the Cohan principle to cases where all the expenditures have been substantiated. See Ellis Banking Corp. v. Commissioner, 688 F.2d 1376, 1383 (11th Cir. 1982), affg. in part and remanding in part on this issue T.C. Memo. 1981-123; Gill v. Commissioner, supra; Boomershine v. Commissioner, supra; Rolland v. Commissioner, supra. In these cases, the courts relied on Cohan to support the propriety of estimating the portions of expenses that were reasonably deductible.

Since the advertising purpose of the race car expenditures was to sell and lease aircraft, a rational estimate of the amounts reasonably deductible on the Icarus consolidated return for each fiscal year is the portion that bears the same ratio to

all the race car expenditures as the ratio of the values of aircraft owned by Dolphin to the values of aircraft owned by all the members of the controlled group. Applying Cohan, we allow Icarus deductions for advertising expenses for fiscal years ended August 31, 1991, 1992, and 1993, in amounts equal to the percentages of the costs of aircraft owned by Dolphin multiplied by the amount of total deductions claimed. This amounts to the following allowed deductions:

| FYE 1991 | FYE 1992 | FYE 1993 |
|----------|----------|----------|
| $23,175  | $16,462  | $37,280  |

2. Includability of Dolphin's Payments in Mr. Ciaravella's Gross Income as Constructive Dividends

Respondent argues that the gross receipts of Innovative representing the race car expenses paid by Dolphin should be removed from the Innovative Schedules C and recharacterized as constructive dividends to Mr. Ciaravella. In general, a dividend is "any distribution of property made by a corporation to its shareholders". Sec. 316(a). There is no requirement that a dividend be formally declared or even intended by the corporation. Loftin & Woodard, Inc. v. United States, 577 F.2d 1206, 1214 (5th Cir. 1978).

The determination of whether a payment by a closely held corporation is a constructive dividend to its sole shareholder is ultimately a question of fact. Hardin v. United States, 461 F.2d 865 (5th Cir. 1972). Generally, the determination requires an inquiry into whether a corporation has conferred an economic

benefit on its shareholder, and whether the item primarily benefits the shareholder's personal interests as opposed to the business interests of the corporation.  Ireland v. United States, 621 F.2d 731, 735 (5th Cir. 1980); Chapman v. Commissioner, T.C. Memo. 1997-147; Gill v. Commissioner, supra.

We have held that substantial portions of the payments made by Dolphin through Innovative to Mr. Ciaravella, which were reported as gross receipts on the Innovative Schedules C, are deductible as advertising expenses of Dolphin.  To the extent that such expenses are deductible by Icarus on the consolidated returns, they do not constitute constructive dividends to Mr. Ciaravella, inasmuch as such amounts primarily benefit the business interests of Dolphin.

The remaining portions of the Innovative gross receipts consist of: (1) The race car expenses paid by Dolphin that are disallowed as deductions on the Icarus consolidated returns; (2) the portion of payments made by Dolphin that were eventually paid to trade publications and magazines in which Dolphin advertised; and (3) payments by third parties for the sale of race car parts and rental of the race car and race car equipment.

We hold that these remaining portions of the gross receipts likewise do not constitute constructive dividends to Mr. Ciaravella.  The portion of the race car expenses that was disallowed as a deduction to Icarus, even though it does not represent amounts expended for the business interests of Dolphin,

represents amounts expended for the business interests of other corporations that are members of the same controlled group as Dolphin.  Because such amounts were not expended primarily for the personal benefit of Mr. Ciaravella, they do not constitute constructive dividends and are not includable in his income. The portion of gross receipts that was paid to the trade publications and magazines in which Dolphin advertised was expended for the business interests of Dolphin, not for the personal interests of Mr. Ciaravella.  The portion of gross receipts that consisted of payments from unrelated third parties cannot be dividends to Mr. Ciaravella because he had no ownership interest in those entities.[5]

## 3. Business Expenses of Innovative

The next issue concerns the deductions for business expenses claimed by Mr. Ciaravella on his Innovative Schedules C for his 1992 and 1993 returns.  Under section 162, an ordinary and necessary expense is deductible if it is "paid or incurred during the taxable year in carrying on any trade or business".  Under section 167, depreciation deductions are allowed for the wear and

---

[5] Respondent argues only that the Schedule C gross receipts should be recharacterized as dividends.  Although respondent mentions in passing that the gross receipts should be recharacterized as dividends (or other income), respondent does not provide any analysis or argument for treatment as other income of the amounts of gross receipts constituting payments from parties other than Dolphin.  Accordingly, we do not reach that question, which would, among other things, require us to deal with the question of the proper treatment of expenses incurred in earning such income. Cf. sec. 183(b).

tear "of property used in the trade or business".  The Supreme Court has said that "to be engaged in a trade or business" generally means that (1) there is an activity; (2) that is carried on with continuity and regularity; and (3) the primary purpose of such activity is income or profit.  Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987); Hughes v. Commissioner, T.C. Memo. 1995-202.

Mr. Ciaravella bears the burden of proving that Innovative is a trade or business that supports his entitlement to deduct business expenses.  Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933).  Applying the teaching of Groetzinger, Mr. Ciaravella has the burden to show that he is engaged in the regular and continuous activity of advertising through his sole proprietorship, Innovative, with the primary motive of profit.

Innovative functioned essentially as a conduit.  The record in the present case lacks any reference to any actual activity in which Innovative is engaged.  Innovative's life has been limited to a checkbook existence, functioning as a financial intermediary.  Although Mr. Ciaravella claims that Innovative was created to handle the advertising for Dolphin so as to qualify for trade discounts, there is no indication in the record that it was doing so during the taxable years at issue.  Trade publications in which Dolphin would advertise would send invoices to, and deal directly with, Dolphin, not Innovative.  The only

role Innovative appeared to play was to function as a checking account, receiving deposits from Dolphin and in turn issuing checks to trade publishers for the advertising expenses of Dolphin.[6]

Innovative played the same role with respect to payments made by Innovative for the race car expenses and boat fuel expenses. Innovative simply acted as a conduit through which Dolphin would reimburse Mr. Ciaravella for expenses incurred in connection with the racing activity. And, although it was Dolphin that provided fuel to the boats that displayed its logo, the fuel expenses were deducted on Mr. Ciaravella's returns as an expense incurred by Innovative.[7] Accordingly, all deductions claimed on Mr. Ciaravella's Schedules C in connection with Innovative are disallowed. Similarly, because Innovative is not a trade or business, respondent's reversal of gross receipts included in Mr. Ciaravella's income is sustained. In short, our treatment of Mr. Ciaravella's Innovative Schedules C, namely, the reversal of gross receipts and disallowance of deductions, in

---

[6] The passive role played by Innovative is further confirmed by the fact that Icarus in its consolidated return with Dolphin deducted the same expenses as Innovative for advertising and for race car expenditures during the years in issue.

[7] Unlike other expenses for which Mr. Ciaravella was reimbursed by Dolphin, the boat fuel was provided by Dolphin directly to the boat racers in exchange for having the Dolphin logo displayed on the boats.

effect amounts to a disallowance of the Innovative Schedules C net losses of $4,137 for 1992 and $9,906 for 1993.

We regard Mr. Ciaravella's racing activity not as his trade or business, carried on by him through a sole proprietorship, but as an activity carried on by him on behalf of Dolphin, for which Dolphin reimbursed him. This is much the same as the case of a corporate officer who voluntarily pays the expenses of an activity conducted for the benefit of his corporate employer. The gross receipts of Mr. Ciaravella, in the name of Innovative, are akin to reimbursements from his corporate employer for race car expenses that he paid out of his own pocket. The net losses claimed on the Schedules C that we have disallowed are akin to payments made by Mr. Ciaravella for racing activities on behalf of Dolphin for which Dolphin did not reimburse him. Voluntary payments by a corporate officer for activities conducted on behalf of his corporate employer, for which he is not reimbursed, are not deductible by the officer, in the absence of an agreement or clear understanding as to a corporate policy that the employee is expected to make such payments, without reimbursement, as part of the conditions of his employment. See, e.g., Westerman v. Commissioner, 55 T.C. 478 (1970); Stone v. Commissioner, T.C. Memo. 1996-507. There is no evidence of any such agreement or understanding in the case at hand.

4. Accuracy-Related Penalty

Section 6662(a) imposes a penalty in an amount equal to 20 percent of the portion of the underpayment of tax attributable to one or more of the items set forth in section 6662(b). Respondent determined that the entire underpayment of Mr. Ciaravella's tax was due to negligence or intentional disregard of rules or regulations. Sec. 6662(b)(1). Under the Treasury Regulations, "The term `negligence' includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws". Sec. 1.6662-3(b)(1), Income Tax Regs. "Disregard" includes any careless, reckless, or intentional disregard of rules or regulations. Sec 6662(c); sec. 1.6662-3(b)(2), Income Tax Regs.

The accuracy-related penalty does not apply to any portion of an underpayment as to which the taxpayer acted with reasonable cause and good faith. Sec. 6664(c)(1). Such a determination is made by taking into account all facts and circumstances, including the taxpayer's experience, knowledge, and education, as well as reliance on a tax adviser. Sec. 1.6664-4(b)(1), Income Tax Regs. Petitioner bears the burden of proving that respondent's imposition of a penalty under section 6662 is erroneous. ASAT, Inc. v. Commissioner, 108 T.C. 147 (1997).

Petitioner argues that he relied on the advice of a tax professional to prepare his tax returns for the years in issue. Reliance on a tax professional is not an absolute defense but is

only a factor to be considered.  Ewing v. Commissioner, 91 T.C. 396, 423-424 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991).  Reliance on a return preparer may demonstrate reasonable cause and good faith if the evidence in the record shows that the taxpayer actually relied on a competent tax adviser and provided the adviser with all necessary and relevant information.  Daugherty v. Commissioner, 78 T.C. 623, 641 (1982); Pessin v. Commissioner, 59 T.C. 473, 489 (1972); Tebarco Mechanical Corp. v. Commissioner, T.C. Memo. 1997-311.

Mr. Ciaravella claims that he relied on the advice of Mr. Buchman, a return preparer, in setting up Innovative and claiming deductions for the race car expenditures.  Mr. Buchman did not testify at the trial, nor was there any other evidence of any particular advice he may have given to Mr. Ciaravella.  Neither did Mr. Ciaravella testify as to any particular advice he received from Mr. Buchman.  Accordingly, we find insufficient evidence that Mr. Ciaravella relied on the advice of a return preparer, and we sustain respondent's imposition of the accuracy-related penalty under section 6662(a).

To reflect the foregoing and respondent's concessions,

Decisions will be entered under Rule 155.