T.C. Memo. 2004-211


UNITED STATES TAX COURT


ESTATE OF ANTOINETTE HARTSELL, DECEASED, DONALD C. RENBARGER,
PERSONAL REPRESENTATIVE, Petitioner $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent.


Docket No. 8009-03.          Filed September 21, 2004.


Steven P. Cole, Jeff L. Todd, and Alan G. Holloway, for

petitioner.

Gary L. Bloom, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


KROUPA, Judge:  Respondent determined a deficiency in the

Federal estate tax of the Estate of Antoinette Hartsell (estate)

of $3,074,408[1] and an addition to tax under section 6651(a)(2)[2] for failure to pay timely.  After concessions, the sole issue for decision is whether the estate is liable for the addition to tax under section 6651(a)(2) for failure to pay its Federal estate tax timely.  We hold that it is liable.

## FINDINGS OF FACT

The parties have stipulated some facts, which we incorporate by this reference.

Antoinette Hartsell (decedent) was domiciled in Oklahoma City, Oklahoma, at the time of her death.  When the petition was filed with the Court, Donald C. Renbarger, the executor, resided in Oklahoma City, Oklahoma.

Decedent died on December 18, 1998, with a gross estate valued in excess of $13 million.  The estate was composed of real properties, mineral interests, royalty interests, stocks, bonds, and accounts receivable.  The stocks had a fair market value of $725,190, and the mineral interests had an estimable return value of $400,000.  Over 70 percent of the value of the taxable estate was attributable to nonliquid assets.

---

[1]All monetary amounts have been rounded to the nearest dollar.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

On April 5, 1999, decedent's Last Will and Testament was admitted to probate by the District Court for Oklahoma County, Oklahoma. Pursuant to the will, decedent devised her entire estate to her friend Donald C. Renbarger (Mr. Renbarger) and expressly disinherited her half-sister and step-sister. Decedent also designated Mr. Renbarger "personal representative" of the estate.

The original due date for the Federal estate tax to be paid was September 20, 1999. Mr. Renbarger submitted a timely request for an extension of time to pay the Federal estate tax under section 6161 and a partial payment of $100,000 toward a total Federal estate tax liability of $4,267,373. Respondent granted the first request for an extension of time to pay through March 16, 2000. Mr. Renbarger submitted a second timely request for an extension of time to pay, which respondent granted through March 18, 2001 (payment due date).

Mr. Renbarger submitted a third request for an extension of time to pay on March 9, 2001. Respondent mailed Mr. Renbarger a request to substantiate reasonable cause for further extending the payment due date. Because Mr. Renbarger failed to substantiate reasonable cause, respondent denied the estate's third request for an extension of time to pay. The final payment due date was therefore March 18, 2001.

Before the payment due date, Mr. Renbarger offered to compromise the estate's Federal estate tax liability of $4,267,373 with respondent for $2,166,000. Respondent initially rejected the offer in compromise (OIC).[3] Mr. Renbarger appealed and respondent requested additional information to support the OIC. Respondent finally denied Mr. Renbarger's appeal of his rejection of the OIC, determining that collecting an amount larger than the estate's OIC would not create an economic hardship.

Mr. Renbarger planned to pay the Federal estate tax by selecting five real properties to advertise for sale without the assistance of a realty company.[4] Mr. Renbarger's asking price for one property was more than three times the value at which it was reported on the estate's Federal estate tax return. By the payment due date, none of the advertised properties was sold or contracted to be sold.

Mr. Renbarger sold only one property before the payment due date. The amount received, $1,572,276, was escrowed for

[3]More specifically, respondent rejected the estate's OIC because respondent's examination showed that: (1) Respondent could collect a larger amount than the estate offered; (2) no exceptional circumstance existed; and (3) the estate failed to establish that an economic hardship would be created by liquidating enough assets to pay the Federal estate tax in full.

[4]On Jan. 16, 2003, almost 2 years after the payment due date, the estate hired a professional realty company to advertise and sell three of its properties.

respondent on May 10, 2000. Over 2 years later and after the payment due date, Mr. Renbarger paid $1.2 million of that amount to respondent. The remainder was used to pay State estate taxes. Mr. Renbarger submitted one additional payment of $168,682 to respondent 2 days before trial.

Since decedent's death, the estate has paid State estate taxes to four States. By the time of trial, the estate had paid $1,433,288 to the State of Oklahoma, $85,704 to the State of Colorado, $18,090 to the State of Kansas, and $12,589 to the State of Texas. In total, the estate has paid State estate and Federal estate taxes of $3,209,052, including interest.

Before her death, decedent had lent $760,000 to Mr. Renbarger's son and $111,000 to Mr. Renbarger. Mr. Renbarger's son ceased making interest payments to decedent of approximately $4,000 per month after she died. As the executor, Mr. Renbarger later forgave the loan to himself and had not, by the trial date, enforced collection of the principal or interest on the loan to his son.

The estate was a party to three cases involving its properties on the payment due date. Three additional cases commenced after the payment due date.

Mr. Renbarger directed two informal inquiries into the possibility of using one of the estate's properties as collateral for a loan in order to pay its Federal estate tax. In both

instances, Mr. Renbarger was told that he would have to personally guarantee the loan, which he refused to do.

Respondent mailed the estate a notice of deficiency and the estate timely filed a petition for redetermination.

OPINION

Section 6651(a)(2) provides for an addition to tax[5] for failure to pay taxes shown on a return on or before the payment due date. The addition to tax under section 6651(a)(2) does not apply, however, if the failure to pay is due to reasonable cause and not due to willful neglect. United States v. Boyle, 469 U.S. 241, 245 (1985); Jackson v. Commissioner, 864 F.2d 1521, 1527 (10th Cir. 1989), affg. 86 T.C. 492 (1986); Crocker v. Commissioner, 92 T.C. 899, 912 (1989); sec. 301.6651-1(a)(2), Proced. & Admin. Regs.

The taxpayer bears the burden of proof as to reasonable cause and willful neglect.[6] Charlotte's Office Boutique, Inc. v. Commissioner, 121 T.C. 89, 110 (2003); Higbee v. Commissioner,

---

[5]The addition to tax is one-half percent of the amount shown as tax on a return for each month or fraction thereof during which the failure to pay continues, not exceeding 25 percent in the aggregate. Sec. 6651(a)(2).

[6]The Commissioner has the burden of production under sec. 7491(c) as to the addition to tax. Sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Sec. 7491(c) only applies, however, to individuals. Even if we assume arguendo that sec. 7491(c) applies to the estate in this case, the estate has conceded that it failed to pay the Federal estate tax timely, and so respondent has met his burden of production.

116 T.C. 438, 446 (2001); Estate of Newton v. Commissioner, T.C. Memo. 1990-208. The taxpayer bears a "heavy burden" of proving both that the failure was due to reasonable cause and not willful neglect. United States v. Boyle, supra at 245.

Failure to pay timely is due to "reasonable cause" if the taxpayer exercised ordinary business care and prudence and was nevertheless unable or would suffer an undue hardship to pay the tax by the due date. Id. at 246; Bank of the West v. Commissioner, 93 T.C. 462, 471 (1989); Estate of Paxton v. Commissioner, 86 T.C. 785, 819 (1986); sec. 301.6651-1(c), Proced. & Admin. Regs.

The reasonable cause standard is a one-time test to be passed or failed at the payment due date. See Indus. Indem. v. Snyder, 41 Bankr. 882, 883 (E.D. Wash. 1984); see also Photographic Assistance Corp. v. United States, 82 AFTR 2d 98-6804, 98-2 USTC par. 50,820 (N.D. Ga. 1998) (failure to offer any explanation for a failure to pay when due prevents any finding of reasonable cause). Events occurring after the due date are still relevant, however, to the reasonable cause determination. See Estate of Sowell v. United States, 198 F.3d 169 (5th Cir. 1999) (distinguishes Indus. Indem., stating that, although later justifications could not stop penalties from accruing, they were not irrelevant).

To satisfy "undue hardship", it must appear that substantial financial loss would result to the taxpayer from making payment by the due date. Sec. 1.6161-1(b), Income Tax Regs.; see also sec. 20.6161-1(a)(2)(ii), Estate Tax Regs. Further, if a market exists, the sale of property at the current market price is not ordinarily considered an undue hardship. Sec. 1.6161-1(b), Income Tax Regs.; see also sec. 20.6161-1(a)(2)(ii), Estate Tax Regs.

Consideration will be given to all the facts and circumstances of the taxpayer's financial condition in determining whether the taxpayer was unable to pay despite the exercise of ordinary business care and prudence. Sec. 301.6651-1(c), Proced. & Admin. Regs.

I. Contentions of the Parties

Mr. Renbarger concedes that he did not pay the estate's Federal estate tax timely but argues that his failure to pay was due to reasonable cause rather than willful neglect. Specifically, Mr. Renbarger argues that he created a plan to pay the Federal estate tax, that the plan was prudent and reasonable, and that he could not have paid the Federal estate tax when due without "extreme hardship".

Respondent counters that the estate failed to show reasonable cause and lack of willful neglect and did not exercise ordinary business care and prudence to pay its Federal estate

tax.  Respondent specifically argues that Mr. Renbarger failed to seriously pursue financing, did not advertise a sufficient amount of real estate to pay the Federal estate tax, preferred State estate tax payments over Federal estate tax payments, and failed to collect outstanding accounts receivable.  For the reasons set forth, the Court agrees with respondent that the estate has failed to show reasonable cause and no willful neglect for its failure to pay timely and is therefore liable for the addition to tax under section 6651(a)(2).

II.  The Estate's Payment History

The estate paid only $100,000 to respondent by the payment due date.  The estate made two additional payments after the payment due date and before trial.  First, the estate paid respondent $1.2 million, its only significant payment, more than 2 years after the payment due date.  Second, the estate paid respondent $168,682 nearly 3 years after the payment due date and just 2 days before trial.

Moreover, the estate's $1.2 million payment was not even attributable to efforts it made to sell property.  Rather, the sale resulted from the buyer's exercise of an option to purchase that decedent had granted before her death.  Further, the proceeds from the sale were deposited in escrow for respondent on May 10, 2000, and yet the estate waited an additional 2 years before it released the funds to respondent.

Mr. Renbarger attributes the more-than-2-year lag in payment to respondent's failure to consent to a release of the funds. We disagree. As respondent explains, the escrow agreement stated that the funds could be released either when respondent sent a closing letter to the escrow agent <u>or</u> "otherwise [consented]". Respondent consented on June 6, 2001, in a letter specifically requesting the estate to provide a "check for $1,564,405.89 plus interest, which is currently being held in escrow". Despite this consent to release, Mr. Renbarger continued to wait another year before he transmitted the funds to respondent, and even then transferred only a portion of the full escrow amount.

Mr. Renbarger also ignored advice from his tax adviser, who specifically recommended that he transmit the escrowed funds to respondent earlier. Mr. Renbarger cavalierly explained that he knew the funds belonged to respondent and that he expected respondent to come and collect the money when he was ready. The estate benefited from the additional interest that accumulated on the escrowed funds in the meantime.

We find that the estate failed to exercise ordinary business care and prudence in waiting more than a year to transmit the escrowed funds to respondent, contrary to respondent's explicit consent and contrary to the advice of the estate's tax adviser.

III. <u>The Estate's Plan To Pay the Federal Estate Tax</u>

We turn now to the merits of Mr. Renbarger's "plan" to raise capital to pay the estate's Federal estate tax. The plan

constitutes the estate's central argument that it exercised ordinary business care and prudence and could not, without undue hardship, sell sufficient property to pay its Federal estate tax by the payment due date. The plan essentially involved selecting five properties to sell, advertising and marketing those properties, and, once they were sold, selecting additional properties to sell.

Mr. Renbarger chose to sell a mere five properties from an estate composed of more than 60 properties. He advertised the properties by placing a single "for sale" sign on each with a phone number. Mr. Renbarger waited, no bids were received, and the deadline, extended twice, passed without payment. One person contacted the estate regarding a property but expressed no interest upon hearing the asking price. Mr. Renbarger did not enlist the assistance of a professional real estate broker and instead relied on his own expertise and that of a small team, which included his two sons.

Mr. Renbarger attributes his lack of success in selling the estate's five properties to macroeconomic events including a slowing economy, the national recession beginning March 2001, the collapse of Enron, the State and national declines in real income, the evaporation of stock investor wealth, and even the uncertainties of war in Afghanistan and Iraq and the events of September 11, 2001. We are unconvinced by Mr. Renbarger's argument, particularly considering that most of the events

occurred on or after the payment due date.  For example, the recession beginning in March 2001, the events of September 11, 2001, and the collapse of Enron in December 2001 all occurred on or after March 18, 2001, the estate's payment due date.

Adverse economic conditions do not necessarily constitute reasonable cause.  See Wolfe v. United States, 612 F. Supp. 605, 607-608 (D. Mont. 1985), affd. on other grounds 798 F.2d 1241 (9th Cir. 1986), amended on denial of rehearing 806 F.2d 1410 (9th Cir. 1986).  In Wolfe, the court considered whether financial difficulties due in part to the Arab oil embargo constituted reasonable cause for failing to pay by the payment due date.  Id.  The court stated that almost every nonwillful failure to pay taxes is the result of financial difficulties, and to allow taxpayers to postpone paying taxes until economic conditions improve would severely restrict the Internal Revenue Service's ability to raise revenue.  Id.

Likewise, the estate has failed to adequately demonstrate how these economic events causally affected its ability to sell properties.  Rather, we attribute the lack of interest in the estate's properties to its arbitrary prices, negligible marketing efforts, too few properties advertised, a desire to save paying third parties other than Mr. Renbarger and his sons, and, overall, a desire to sell at a profit rather than at current market prices.  See sec. 20.6161-1(a)(2)(ii), Estate Tax Regs.

We find that the estate did not adequately determine reasonable prices at which the five advertised properties could sell. Asked how prices were calculated, Mr. Renbarger stated simply that he put a figure on them and waited for an offer to come along. One witness for the estate testified that little research was conducted to ascertain proper sales prices and that Mr. Renbarger would merely declare a price and place a "for sale" sign on the property. These arbitrary price determinations are exemplified by one property's being priced at three times the value at which it was reported on the estate's Federal estate tax return.[7]

While the Court does not begrudge Mr. Renbarger's attempt to profit from sales of estate property, he cannot do so and simultaneously urge the Court to find that the estate faced an undue hardship because it could sell only at sacrifice prices. See sec. 20.6161-1(a)(2)(ii), Example (2), Estate Tax Regs. No undue hardship exists where a taxpayer can sell at current market values. See sec. 1.6161-1(b), Income Tax Regs. (if a market exists, the sale of property at the current market price is not ordinarily considered an undue hardship). Mr. Renbarger has failed to demonstrate that he ever offered the five properties at

---

[7]The reported value of the Garden Ridge Property in the estate's Federal estate tax return was $1,294,700. The asking price was approximately $3,833,000.

current market prices, much less sacrificial prices or, for instance, received an offer at a sacrifice price.

Additionally, Mr. Renbarger's braggadocio at reaping large profits from sales after the payment due date further undermines his argument that he could sell only at sacrifice prices. Mr. Renbarger claimed the plan was succeeding because "it brought in at least 40 percent more value to the estate" when the properties sold after the due date at his original asking prices. When asked whether he received fair values, Mr. Renbarger testified that he got "way more than the appraisal" on the properties. The record therefore demonstrates that Mr. Renbarger's dominant motivation was to reap a profit rather than pay by the payment due date.

The estate's failure to list properties with a realty company before the due date also exhibits a lack of ordinary business care and prudence. Mr. Renbarger's explanation was merely that he wanted to save the 6- to 8-percent commission. Avoiding fees cannot constitute reasonable cause for paying late, however, particularly where the estate had virtually no success of its own in selling property. A more prudent course would have been to hire a realty company when it became apparent the five properties advertised for sale would not sell by the payment due date.

Further, Mr. Renbarger's choice to advertise five of approximately 60 properties constituted too limited an attempt to raise sufficient capital to pay the Federal estate tax. By Mr. Renbarger's own admission, proceeds from the five properties would not fully satisfy the estate's Federal tax liability, but rather would make a "big impact" toward that liability. Regardless, Mr. Renbarger refused to advertise more properties because, he testified, he saw no reason to deviate from his plan, despite not receiving a single offer by the payment due date. This sentiment runs counter to the mandated duties of an executor and the obligations of an estate in meeting Federal estate tax obligations. Here, the estate's properties were situated in four States and 21 counties. Additional properties could have been advertised for sale, and contrary to testimony from one of the estate's experts, without worry of depressing prices in any single local market. Overall, we find Mr. Renbarger's plan did not constitute the serious effort required to pay the Federal estate tax timely.

IV. Whether the Estate Faced Cessation of a Going Concern

Mr. Renbarger argues that the estate would have suffered an undue hardship to pay the Federal estate tax by the payment due date. Mr. Renbarger relies on Estate of La Meres v. Commissioner, 98 T.C. 294 (1992), for this proposition. We find the facts in Estate of La Meres distinctly different from the

facts before us.  The Court in <u>Estate of La Meres</u> discussed "undue hardship" in the context of a section 6166 election and a closely held business, specifically addressing an example in the regulations.  See sec. 20.6161-1(a)(2)(ii), <u>Example</u> (<u>1</u>), Estate Tax Regs.  Undue hardship may exist where a farm or other closely held business constitutes a significant portion of an estate and sufficient funds could be raised from "other sources" to pay the estate tax if a section 6161 extension to pay were granted.  <u>Id.</u> This is not the case here.

First, the example in section 20.6161-1(a)(2)(ii), Estate Tax Regs., addresses situations where a taxpayer faces the cessation and sale of a farm or other closely held business in order to pay the Federal estate tax but does not meet the threshold 35-percent requirement in section 6166(a)(1).[8]  In our case, the estate had no going concern of its own, and hence whether the estate might qualify under section 6166 is not at issue.  Second, Mr. Renbarger had no plan to raise money from "other" sources.  Mr. Renbarger specifically stated that he would not grant the personal guaranty he claimed was necessary to obtain a loan and that he was not willing to sell the estate's liquid assets.  Instead, Mr. Renbarger requested an extension of time to pay so he could continue advertising for sale precisely

--------

[8]An estate may elect to pay its Federal estate tax liability in installments if the value of a closely held business exceeds 35 percent of the adjusted gross estate.  Sec. 6166(a)(1).

the same limited number of properties he had previously advertised for sale. Finally, the taxpayer in Estate of La Meres erroneously assumed that a proper section 6166 election had been made and that its due date for payment was postponed. Id. at 313. Mr. Renbarger was fully aware that the estate's payment due date had passed.

V. Administrative Burden of Ongoing Litigation

We now address Mr. Renbarger's claim that pending litigation presented an extraordinary administrative burden on the estate. An estate's involvement in proceedings that might affect the estate tax does not constitute reasonable cause for late payment. See Estate of Duttenhofer v. Commissioner, 49 T.C. 200, 206-207 (1967) (pending litigation, even where the outcome would affect the determination of an estate tax, is not reasonable cause for failing to file an estate tax return timely), affd. per curiam 410 F.2d 302 (6th Cir. 1969); Porter v. Commissioner, 49 T.C. 207, 226-227 (1967) (pending litigation affecting the fair market value of a taxpayer's interest in property at the time of death was not reasonable cause for untimely filing).

The estate has failed to show how litigation significantly affected its administration. For instance, Mr. Renbarger testified that he gave the cases to the estate's attorney and that "he gets after [them]." Further, only three of the six cases were commenced before the payment due date, which is the

point at which we determine whether reasonable cause existed. Accordingly, we do not find the ongoing litigation imposed a unique or an undue hardship on the estate.

VI.  The Estate's Attempts To Obtain Alternative Sources of Financing

Next we address respondent's arguments that the estate failed to pursue other sources of potential financing or income to pay its Federal estate tax.  The estate consists principally of non-income-producing property.  Consequently, Mr. Renbarger claimed the few liquid assets the estate owned and the income they produced were needed to maintain the estate.  Mr. Renbarger therefore claims that the estate could raise money only by advertising and selling its real properties.  Respondent counters that the estate failed to make reasonable efforts to obtain alternative financing.

Respondent first claims Mr. Renbarger failed to exercise ordinary business care and prudence in forgiving two of the estate's accounts receivable and not enforcing collection of interest payments on one.  Before her death, decedent had lent $111,000 to Mr. Renbarger and $760,000 to his son, Randy Renbarger.[9]  Randy Renbarger made monthly interest payments of approximately $4,000 to decedent in connection with his loan but instantly stopped making monthly interest payments at decedent's

---

[9]Decedent financed her $760,000 loan to Randy Renbarger by obtaining a mortgage on certain property she owned.

death.  Mr. Renbarger made no effort, however, to collect either of the outstanding loans or to collect interest payments from his son.

Mr. Renbarger forgave the loan to himself according, he claims, to decedent's wishes.  In addition, Randy Renbarger testified that his interest payments were contingent upon his "ability to pay", which coincidentally stopped in the same month decedent died.[10]  Mr. Renbarger thereafter refused to enforce collection of interest payments on Randy Renbarger's loan, because he was now the sole beneficiary and, because the loan to his son became his personal property, he just "called it off". We find Mr. Renbarger's relinquishment of the estate's right to accounts receivable and interest payments at a time it owed a significant Federal estate tax not consonant with ordinary business care and prudence.

Respondent also claims the estate made insufficient efforts to obtain a loan.  Mr. Renbarger counters that he made two informal inquiries, but that in both instances he would have had to personally guarantee the loan, which he was not willing to do.[11]  There is no evidence in the record that Mr. Renbarger ever

---

[10]No promissory note for Randy Renbarger's loan was submitted into evidence.

[11]Respondent asserts that Mr. Renbarger's failure to consider granting a personal guaranty to obtain a loan or contributing proceeds he received from two annuity contracts to
(continued...)

submitted a formal loan application, and we can infer none was made.  See Helvering v. Natl. Grocery Co., 304 U.S. 282, 294 (1938) ("To draw inferences, to weigh the evidence and to declare the result is the function of the * * * [U.S. Tax Court]."); see also Wichita Terminal Elevator Co. v. Commissioner, 162 F.2d 513, 515 (10th Cir. 1947), affg. 6 T.C. 1158 (1946).  We find both inquiries inadequate to prove ordinary business care and prudence.  Both requests were informal and both involved only a single property as collateral.

The estate also made no effort to sell or borrow against the estate's mineral interests or its portfolio of stocks and bonds. Respondent argues this is an additional indicium that the estate failed to exercise ordinary business care and prudence in attempting to pay its Federal estate tax.  We agree.

VII.  The Estate's Preferential State Estate Tax Payments

The estate made a number of State estate tax payments in preference to paying its Federal estate tax.  Respondent contends that this further shows a lack of reasonable cause for failing to

---

[11](...continued)
the Federal estate tax is further evidence that the estate failed to show ordinary business care and prudence in paying its tax obligation.  While there is some authority for holding an executor personally liable for the estate tax, the weight of authority seems to hold an executor liable only for a fiduciary breach.  See Schwartz v. Commissioner, 560 F.2d 311 (8th Cir. 1977), revg. and remanding T.C. Memo. 1975-267; Leigh v. Commissioner, 72 T.C. 1105 (1979).  But see Baldwin v. Commissioner, 94 F.2d 355 (9th Cir. 1938).  There is a strong argument that the executor has breached his fiduciary duties here, but that question is not before the Court.

pay the estate tax timely. Mr. Renbarger counters that the Internal Revenue Code mandates that State estate taxes actually be paid before Federal estate taxes. We disagree with Mr. Renbarger's characterization of the Code. Section 2011(c)(2) allows a credit for State estate taxes up to 4 years after the filing of the Federal estate tax return or up to the expiration date of any section 6161 extension of time to pay. See Howard v. United States, 40 F. Supp. 697 (E.D. La. 1941) (courts cannot extend this period), affd. on other grounds 125 F.2d 986 (5th Cir. 1942).

Mr. Renbarger also asserts but did not substantiate that respondent's Appeals Office advised him to pay State estate taxes before Federal estate taxes so the estate might receive the section 2011 credit for State estate taxes paid. As respondent correctly points out, the estate had already begun paying State estate tax before the purported advice. Any advice therefore could not have been given before the payment due date because respondent did not commence examination of the estate's Federal estate tax return until May 14, 2001. Consequently, Mr. Renbarger makes a disingenuous argument when he claims the advice influenced his decision to prefer State estate tax payments over Federal estate tax payments.[12]

---

[12]We are aware of the State estate tax credit phase-out under sec. 2011. In this case, the estate could credit State estate tax payments actually paid until approximately February 2004, 4 years from the date it filed its Federal estate tax

(continued...)

- 22 -

VIII.  Executor's Business Experience

        Finally, we are unpersuaded by Mr. Renbarger's assertion

that he lacked the necessary business education and experience to

liquidate over $6 million in assets to pay Federal and State

estate taxes and administrative expenses.  There is no cause to

find an experienced executor incompetent to manage the affairs of

an estate where the executor is experienced in business.  Estate

of Thomas v. Commissioner, T.C. Memo. 2001-225 (executrix was not

a naive, incapacitated, elderly citizen but rather an experienced

businesswoman).  In this case, Mr. Renbarger had sufficient

business expertise to act as the executor.  He was a 99-percent

owner of Westgate Market Place Developers, L.L.C., and was

involved in numerous real estate transactions, including many

with the estate's properties.  We also note that Mr. Renbarger is

quick to allege his incompetence when it supports his argument

but was apparently content to rely substantially on his own

expertise when he assembled his "small team", made up of his two

sons, a certified public accountant, and a nonpracticing real

estate broker,[13] and, we assume, content to collect his nearly $1

million fee to date as an executor.  In view of Mr. Renbarger's

_____

        [12](...continued)
return.  The amount the estate could credit under sec.
2011(b)(2)(B) dropped, however, to 75 percent in 2002, 50 percent
in 2003, and 25 percent in 2004, which may have influenced the
estate's decision to prefer paying State estate tax over Federal
estate tax.

        [13]This individual was also Mr. Renbarger's partner in
Westgate Market Place Developers, L.L.C.

apparent business experience, we do not find him unqualified to act as the executor.

## IX. Conclusion

Congress prescribed the civil penalty to ensure timely payment of tax. The statutory deadline provision is clear. It mandates that the Federal estate tax be paid by the executor under section 2002 and that payment be remitted at the time prescribed for filing under section 6151 (or a later date if extended). This is a case where the executor was the only heir to the entire estate. In that dual capacity, he possessed complete control over each aspect of the estate and its administration. He faced no opposition to any action he chose to take. In light of this unbridled authority and the negligible payment of $100,000 by the payment due date toward a Federal estate tax liability of approximately $4.2 million, the Court finds that the estate demonstrably failed to carry its burden of proving that its failure to pay the tax timely was due to reasonable cause and not willful neglect. Accordingly, the estate is liable for the addition to tax under section 6651(a)(2).

To reflect the foregoing regarding the addition to tax and the concessions of the parties regarding the non-addition-to-tax issues,

Decision will be entered

under Rule 155.