T.C. Memo. 2014-237

UNITED STATES TAX COURT

WILLIAM D. EVANS AND CAROLINE F. EVANS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 28012-11.                    Filed November 20, 2014.

<u>Tim Alan Tarter</u>, for petitioners.

<u>Kimberly Clark</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined deficiencies of $55,326 and

$42,243 and section 6662(a) accuracy-related penalties of $11,065 and $8,449 in

petitioners' Federal income tax for 2006 and 2007, respectively.[1]  After

_____

[1]  Unless otherwise indicated, all section references are to the Internal

(continued...)

[*2] concessions,[2] the issues for decision are: (1) whether expenses that were related to petitioners' son's motocross racing activity and deducted by their construction business were ordinary and necessary for their business for purposes of section 162; (2) if so, whether the expenses were reasonable; (3) whether petitioners may deduct section 179 expenses for a motorhome acquired for use in the motocross racing activity; and (4) whether petitioners are liable for section 6662(a) accuracy-related penalties.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioners resided in Idaho at the time they filed the petition.

---

[1] (...continued)
Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts have been rounded to the nearest dollar.

[2] Petitioners concede that the motocross racing activity is not directly related to their construction business. Additionally, respondent argues that petitioners reported income from the motocross racing activity on line 1, Gross receipts or sales, of their 2006 and 2007 Schedules C, Profit or Loss From Business, when they should have reported the income on line 6, Other income. Petitioners did not address this argument at trial or on brief and are deemed to have conceded this issue. See Mendes v. Commissioner, 121 T.C. 308, 312-313 (2003).

**[*3]** I. <u>Dave Evans Construction</u>

Dave Evans Construction (DEC) is a general contractor based in Boise, Idaho. DEC is licensed to operate in Idaho and is not licensed to operate in any other State. DEC develops land and constructs residential homes and commercial buildings in the Boise area. DEC had gross revenues of over $16.2 million in 2006 and over $16.7 million in 2007.

For the first half of 2006 petitioners operated DEC as a sole proprietorship. Beginning in mid-2006 petitioners operated their construction business as an S corporation under the name Dave Evans Construction, LLC.[3]

II.      <u>Motocross Racing Activity</u>

Motocross racing is a motorsport in which competitors race motorcycles at high speeds on dirt courses containing jumps and obstacles. The sport is physically demanding, and injuries are common. To be successful, riders must keep themselves and their motorcycles in top condition.

Boise, Idaho, along with the surrounding Treasure Valley region, is a major center for motocross racing and other off-road racing sports. There are several racecourses and motorcycle clubs within just a few miles of Boise. A local race

---

[3] We refer to Dave Evans Construction and Dave Evans Construction, LLC, interchangeably as DEC throughout the remainder of this opinion.

[*4] can easily attract 1,000 riders. Two local motocross businesses, Carl's Cycle Sales and Western Power Sports, have grown to become major suppliers of off-road racing equipment across the country.

Motocross racing is especially popular within the local construction industry. Many members of Boise's construction industry ride at the local races or have children who ride, and Mr. Evans is no exception. Petitioners' three sons and two daughters all race motorcycles, at least on occasion, and one of their sons, Ben Evans (Ben), had the natural talent and drive to race at a professional level.

A.    Ben's Racing Background

Ben was born in 1990. He first started motocross racing when he was six years old and quickly demonstrated that he had a special talent. While his siblings competed only in local races, at the age of seven Ben competed in a nationally televised race at the Seattle Kingdome. As a teenager he competed on the national amateur circuit and in 2007 won the Amateur Motocross National Championship 458 Pro Sport class at the Loretta Lynn[4] Motocross Ranch (Loretta Lynn) in Nashville, Tennessee. The Loretta Lynn title is the premiere title in the national amateur racing circuit. Every year 25,000 entrants compete to qualify to race at Loretta Lynn, but only 40 actually make it to the championship. A racer who

_____

[4] The event is named after the country singer of the same name.

[*5] places in the top five finishers of the Pro-Sport class at Loretta Lynn qualifies for a license to compete on the professional circuit. In other words, placing in the top five at Loretta Lynn is a prerequisite for becoming a professional motocross racer. Following his 2007 win at Loretta Lynn, Ben began racing on the professional circuit.

Motocross racing is an expensive sport, but petitioners were supportive of their children's interest in racing. Petitioners personally paid for the motorcycles their children rode, parts, travel, and race entry fees. In 2005, however, Ben's racing career started to take off. He competed in nationally televised races and was featured in various motocross magazines, including Amateur MX Magazine and Racer X Magazine. Sponsors, including American Honda, Carl's Cycle Sales, Western Power Sports, and Step One Graphics, started "coming out of the woodwork" to support him. At this point Mr. Evans realized that his son's talent and "star power" might help to boost DEC's business. He consulted with his certified professional accountant (C.P.A.), Bill Anderson, who advised him that supporting Ben's motocross racing could be a valid promotional activity for DEC. DEC subsequently became one of Ben's sponsors.

**[*6]** B.     DEC's Promotional Expenses

In 2006 and 2007 DEC had motocross-racing-related expenses (excluding depreciation and section 179 expenses) totaling at least $86,619 and $74,579, respectively.  These expenses consisted mostly of payments for motorcycles, parts, equipment, racing fees, membership fees, fuel, and food.  DEC also received income totaling $19,940 and $23,500 in 2006 and 2007, respectively, stemming from the motocross racing activity.[5]  The 2006 income primarily comprised proceeds from the sale of certain motorcycles, and the 2007 income primarily comprised motorcycles and parts received from Honda as part of a sponsorship deal.

Apart from sponsoring Ben's motocross racing, DEC engaged in only limited promotional activities.  DEC's other advertising expenses totaled $4,571 in 2006 and $1,388 in 2007 and comprised payments for signs and radio and newspaper advertising.

DEC stopped paying for Ben's motocross-racing-related expenses after he began racing on the professional circuit.

---

[5] Of these amounts petitioners reported $12,149 and $14,000 on line 1, Gross receipts or sales, of their 2006 and 2007 Schedules C, respectively. Petitioners are deemed to have conceded that this income should have been reported on line 6, Other income.  See supra note 2.

**[*7]**       1.       Motocross Assets

During the years in issue DEC purchased three capital assets for the motocross racing activity: a 2006 Jayco motorhome (motorhome), a 26-foot Mirage trailer (Mirage trailer), and a utility trailer. The motorhome was placed into service in 2006, and the two trailers were placed into service in 2007.

During the years in issue Ben usually traveled to races with one or two adults (usually a hired mechanic, one of his older brothers, and/or his father), who acted as his mechanics. Ben also needed an adult to sign a waiver before each race, because he was a minor during most of the relevant period. They drove the motorhome to and from each of Ben's races during the years in issue and used it to carry equipment. The rear section of the motorhome was used as a garage where Ben and his mechanic could make repairs and had space for two or three motorcycles. The motorhome had been modified so that its entire rear wall could fold down at the push of a button, creating a ramp for rolling the motorcycles on and off. Throughout 2006 and into 2007, the motorhome was used to haul the motorcycles to and from Ben's races.

The motorhome also had room to sleep up to three people. Ben slept in the motorhome when he was away from home for races along with whoever traveled with him.

[*8] In 2007 Ben received five motorcycles from American Honda as part of the aforementioned sponsorship deal. Having these motorcycles allowed Ben to compete in multiple classes at every race. However, because the motorhome was not large enough to carry all five motorcycles, DEC purchased the Mirage trailer for that purpose. After DEC purchased the Mirage trailer, Ben and his team continued to use the motorhome to drive to the races and hitched the Mirage trailer to the back.

When Ben was competing at a race, the Mirage trailer was typically parked in the pit area next to the racecourse. Spectators were allowed to enter this pit area to see the various riders, their motorcycles, and the racers' trailers. They would often ask for autographs, and Ben would give out posters containing his picture and logos of his sponsors, including DEC. Ben would often hand out these posters to fans he met back in Boise, as well. Some of Ben's sponsors had logos displayed on the sides of the Mirage trailer, and DEC had a large logo prominently displayed. Sponsors' logos were also placed on Ben's motorcycles, and DEC had logos on the motorcycles' air boxes.

### 2. Promotional Benefits From Motocross Racing

Boise's construction industry was particularly competitive during the years in issue, but sponsoring Ben helped give DEC an advantage over its competitors.

[*9] Throughout Boise, Ben was well known as a motocross racer. Because many of DEC's jobs came through word of mouth, its relationship with the local community played an important role in driving business. DEC's association with Ben thus played an important role in boosting DEC's exposure and goodwill within the community.

In addition to improving DEC's community relations and attracting more clients, Ben's celebrity status also helped DEC attract investors, such as Carl's Cycle Sales, for its projects. DEC's connection to Ben also helped it secure a major source of financing: Len Williams, the president of Home Federal Bank, first met Mr. Evans at a motocross race when he asked for Ben's autograph; his bank is now DEC's largest construction lender. DEC's connection to Ben also helped it to strengthen its relationships with local subcontractors, thus giving it an advantage over its competitors in securing the best local subcontractors for its projects and occasionally getting discounted rates.

III.  Tax Return Preparation

On or around September 17, 2007, DEC filed Form 1120S, U.S. Income Tax Return for an S Corporation, for 2006. The Form 1120S for 2006 states that the effective date of DEC's S election was July 1, 2006. DEC claimed deductions for expenses relating to the motocross racing activity that were incurred between

[*10] July 1 and December 31, 2006. Around the same time, petitioners filed Form 1040, U.S. Individual Income Tax Return, for 2006. Petitioners claimed deductions for expenses relating to the motocross racing activity incurred between January 1 and June 30, 2006, on Schedule C. Deductions claimed for expenses incurred during the remainder of the year flowed through to petitioners on Schedule E, Supplemental Income and Loss. Petitioners reported a total tax of $511,853 on their 2006 tax return.

On or around September 15, 2008, DEC filed its Form 1120S for 2007. DEC claimed a deduction for expenses relating to the motocross racing activity for the year. On or around September 19, 2008, petitioners filed their Form 1040 for 2007. Petitioners reported a total tax of $583,168 on their 2007 tax return. The amounts of petitioners' and DEC's claimed deductions for the years in issue, as well as the amounts they claimed as deductions under section 179, are listed in the table below:

**[*11]**

Sec. 179 deduction

| Year | Taxpayer | Motocross deduction | Asset | Amount |
|------|----------|---------------------|-------|--------|
| 2006 | Petitioners | $44,995 | Motorhome[1] | $66,783 |
| 2006 | DEC | 41,624 | --- | --- |
| 2007 | DEC | 74,579 | Motorhome[2] | [3]20,186 |
|      |          |        | Mirage trailer | 11,704 |
|      |          |        | Utility trailer | 8,413 |

[1] DEC purchased a 50% interest in the motorhome in 2006. Zach Evans Construction (ZEC), a company owned by one of Mr. Evans' sons, purchased the other 50%.

[2] In 2007 DEC spent $26,295 to acquire ZEC's 50% interest in the motorhome.

[3] DEC also claimed a depreciation deduction of $6,109 for the remaining value of the ownership interest acquired from ZEC.

For reasons unexplained in the record, petitioners and DEC claimed the motocross racing activity expenses (excluding section 179 deductions, which were listed separately on the returns) as part of their cost of goods sold on each of their returns. Petitioners' returns contain no indications that the amounts claimed for cost of goods sold include the motocross racing activity expenditures. On its Forms 1120 DEC reported the motocross racing activity expenses as part of the amounts on line 5, Other costs, of Schedule A, Cost of Goods Sold. Each of DEC's returns also included a statement indicating that line 5 included amounts

**[\*12]** for "Promotional" costs. Those promotional costs correspond to the motocross racing activity expenses.

DEC's and petitioners' 2006 and 2007 returns were prepared by petitioners' C.P.A., Mr. Anderson.[6] Mr. Anderson worked with Dyan Chacon, a C.P.A. who performs financial analysis for DEC as an independent contractor, to prepare the returns. Ms. Chacon provided Mr. Anderson with financial documents and answered questions that arose during the preparation of the returns.

## OPINION

### I.    Burden of Proof

As a general rule, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving that those determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). There are exceptions to this rule. Section 7491(a) shifts the burden of proof to the Commissioner as to any factual issue relevant to a taxpayer's liability for tax if the taxpayer meets certain conditions. Higbee v. Commissioner, 116 T.C. 438, 440-441 (2001). With one exception,[7] this case is

---

[6] Mr. Anderson passed away in 2009.

[7] Petitioners argue that they have introduced credible evidence that all the expenses at issue were properly deducted as advertising costs and the burden of

(continued...)

[*13] decided on the preponderance of the evidence and is not affected by the burden of proof or section 7491(a).

II.     Ordinary and Necessary Business Expenses

    A.     Background

    Taxpayers are allowed a deduction for ordinary and necessary expenses paid or incurred in carrying on a trade or business. Sec. 162(a). Whether an expenditure is ordinary and necessary is generally a question of fact. Commissioner v. Heininger, 320 U.S. 467, 475 (1943). Generally, for an expenditure to be an ordinary and necessary business expense, the taxpayer must show a bona fide business purpose for the expenditure; there must be a proximate relationship between the expenditure and the business of the taxpayer. Challenge Mfg. Co. v. Commissioner, 37 T.C. 650 (1962); Henry v. Commissioner, 36 T.C. 879 (1961); sec. 1.162-1(a), Income Tax Regs. To be "necessary" within the meaning of section 162, an expense needs to be "appropriate and helpful" to the taxpayer's business. Welch v. Helvering, 290 U.S. at 113. The requirement that an expense be "ordinary" connotes that "the transaction which gives rise to it

---

[7] (...continued)
proof has shifted. However, with respect to the utility trailer, petitioners have failed to introduce any evidence specifying its use in or relation to the motocross racing activity. We find that the burden of proof regarding this issue has not shifted to respondent.

**[\*14]** must be of common or frequent occurrence in the type of business involved." <u>Deputy v. du Pont</u>, 308 U.S. 488, 495 (1940) (citing <u>Welch v. Helvering</u>, 290 U.S. at 114).

Even if an expense is ordinary and necessary, it is deductible under section 162 only to the extent it is reasonable in amount. <u>United States v. Haskel Eng'g & Supply Co.</u>, 380 F.2d 786, 788-789 (9th Cir. 1967); <u>Gill v. Commissioner</u>, T.C. Memo. 1994-92, <u>aff'd without published opinion</u>, 76 F.3d 378 (6th Cir. 1996); <u>Brallier v. Commissioner</u>, T.C. Memo. 1986-42. The element of reasonableness is inherent in the phrase "ordinary and necessary" in section 162. <u>Haskel Eng'g & Supply Co.</u>, 380 F.2d at 788-789.

     B.    <u>Whether the Motocross Racing Activity Expenses Were Ordinary and Necessary</u>

We have previously found proximate relationships to exist between various car racing activities undertaken for promotional purposes and businesses engaged in construction, <u>Boomershine v. Commissioner</u>, T.C. Memo. 1987-384, 1987 Tax Ct. Memo LEXIS 382; the buying and selling of aircraft, <u>Ciaravella v. Commissioner</u>, T.C. Memo. 1998-31, 1998 WL 24217; and the serving of pizza, <u>Brallier v. Commissioner</u>, T.C. Memo. 1986-42.

[*15] Petitioners argue that, similar to the businesses in the above cases, DEC's construction business had a proximate relationship with the motocross racing activity. Respondent argues that no proximate relationship exists and the above cases are distinguishable because: (1) the motocross racing activity expenses were actually personal expenses; (2) DEC operated in Boise whereas most of Ben's races took place outside of that area; and (3) petitioners have not shown that the motocross racing activity brought in new customers. We agree with petitioners.

      1.    <u>The Motocross Racing Activity Expenses Were Not Personal Expenses</u>

Respondent does not dispute that motocross racing is a popular and high-profile sport within the Boise area and especially within the local construction industry. Motocross racing's local popularity, coupled with Ben's success in the sport during the years in issue, earned him a certain celebrity status. By sponsoring Ben and having its logos placed prominently on the Mirage trailer, Ben's motorcycles, and promotional posters, DEC was able to capitalize on this celebrity status, which naturally led to increased exposure for DEC amongst potential clients, investors, and subcontractors.

Nevertheless, respondent argues that petitioners had DEC sponsor Ben's motocross racing for personal reasons. The facts, however, do not support

[*16] respondent's position. As respondent states: "Petitioners have raised five children, all of which [sic] ride motorcycles." Petitioners supported all of their children in their motorcycle racing pursuits but deducted expenses only for Ben's activity because he was the only one of their children to attain a level of fame in motocross racing that held promotional value to DEC. Petitioners made the decision, after consulting with their C.P.A., to treat Ben's racing activity as a form of promotion for DEC's business because they reasonably calculated that it would be beneficial to DEC. And DEC was not the only company to take advantage of Ben's promotional value: Ben had a number of other corporate sponsors including Western Power Sports, Carl's Cycle Sales, American Honda, and Step One Graphics. Nor are we concerned, as is respondent, that petitioners stopped paying motocross racing activity expenses after Ben became a professional in 2007. By that point Ben's career had gained sufficient momentum that he could achieve the kind of success that would generate publicity for DEC without its direct financial support.

### 2. Races Outside of Boise Benefited DEC

Respondent argues that the motocross racing activity's promotional value was virtually nonexistent because most of Ben's races took place outside of the Boise area whereas DEC performs work only in Idaho. We disagree. We have

**[*17]** previously held that a taxpayer could deduct expenses for racing activities conducted outside the area where the taxpayer did business. See Brallier v. Commissioner, T.C. Memo. 1986-42.

Moreover, Ben's increasing national stature--fueled by his participation in races on the national circuit--served to improve his fame and name recognition locally. Many of DEC's customers and business partners were fans of motocross racing, and petitioners have established that its association with a rising star in motocross racing helped DEC generally to gain new business connections and to strengthen existing ones. Petitioners have also established that these connections helped DEC's business in more specific ways. For example Home Federal Bank is now DEC's largest source of commercial funds, Carl's Cycle Sales has invested in several of DEC's projects, and at least one subcontractor has given DEC discounted rates for its services.

Respondent argues, however, that most of the benefits DEC garnered from the motocross racing activity came in the form of connections to vendors, subcontractors, and banks--rather than customers--and the facts of this case are therefore distinguishable from those in our prior cases. We disagree. First, we find that petitioners' witnesses have credibly testified that sponsoring Ben's motocross racing activity did help DEC to attract business. But even if many of

**[*18]** the benefits DEC received came in the form of deals with subcontractors as opposed to purchases by more customers, we are nonetheless convinced that the development of those business relationships with members of the construction industry had a positive effect on DEC's bottom line. Accordingly, we find that the motocross racing activity expenses, with one exception,[8] were ordinary and necessary.

      C.      Whether the Motocross Racing Activity Expenses Were Reasonable

Because we find that the motocross racing activity expenses were ordinary and necessary, we must now determine whether they were reasonable in amount. We have previously determined the extent to which advertising expenses are reasonable by comparing the amount expended for the activity in question with the amount of benefit reasonably expected to be derived. Ciaravella v. Commissioner, 1998 WL 24217, at *7; see also Sanitary Farms Dairy, Inc. v. Commissioner, 25 T.C. 463, 467 (1955).

---

    [8] Respondent argues, on brief, that petitioners failed to introduce any evidence regarding how the utility trailer was used in the motocross racing activity. There is no evidence in the record regarding the use of the utility trailer, and petitioners did not offer a response to this argument in their reply brief. Accordingly, we find that petitioners are not entitled to deduct as advertising expenses any expenses related to the utility trailer.

[*19] Petitioners argue that the motocross racing activity expenses, which constituted less than 1% of DEC's gross receipts in each year, were reasonable. Respondent argues that petitioners have not provided any information regarding the average amount spent on advertising by entities in similar businesses and that petitioners' motocross racing activity expenditures were unreasonable in the light of DEC's other advertising expenses, which were only $4,571 in 2006 and $1,388 in 2007. Respondent also argues that, as a general rule, expenses should not be considered reasonable simply because they equal a small percentage of a company's gross receipts.

Respondent is correct that petitioners have not presented any evidence regarding the average advertising budgets of similar entities. Nor have petitioners presented evidence of the value of the promotional benefits DEC gained from Ben's racing activities. On the other hand, we are convinced, on the basis of the evidence before us, that DEC derived significant benefits from the motocross racing activity. Accordingly, we resolve the issue of reasonableness using the principles established in Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930).

When taxpayers establish that they have incurred deductible expenses but are unable to substantiate the exact amounts, we can estimate the deductible amount in some circumstances, but only if the taxpayers present sufficient

[*20] evidence to establish a rational basis for making the estimate. See, e.g., id. at 543-544; Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985). In estimating the amount allowable, we bear heavily against taxpayers whose inexactitude is of their own making. See Cohan v. Commissioner, 39 F.2d at 544.

Although Cohan is a case of substantiation, we, as well as other courts, have extended the Cohan principle to cases where all the expenses have been substantiated. See Ellis Banking Corp. v. Commissioner, 688 F.2d 1376, 1383 (11th Cir. 1982), aff'g in part, remanding in part on this issue T.C. Memo. 1981-123; Ciaravella v. Commissioner, 1998 WL 24217, at *8. For example, in Boomershine we considered whether a company's car racing expenditures were reasonable. Similar to the evidence in the present case, the record before us in Boomershine "contain[ed] no information as to the average amount spent on advertisement by entities engaged in similar trades or businesses". Boomershine v. Commissioner, 1987 Tax Ct. Memo LEXIS 382, at *9 & n.10. We determined that advertising expenditures of roughly 4%-5% of the company's gross receipts for each year were reasonable. Id.

We took a similar approach in Lang Chevrolet Co. v. Commissioner, T.C. Memo. 1967-212, 1967 Tax Ct. Memo LEXIS 50. In Lang Chevrolet, an automobile dealership reported racing expenses as a form of advertising during the

**[\*21]** two years in issue. <u>Id.</u>, 1967 Tax Ct. Memo LEXIS 50, at \*7. We found that the dealership's combined advertising expenses, including those for racing, constituted 0.7% of the total gross sales during one year and 1% of the total gross sales for the other year. "[We did] not consider the amounts expended on racing to be out of proportion when compared to the extent of radio and newspaper coverage derived." <u>Id.</u> at \*13.

Petitioners' racing promotion expenses are comparable to those in <u>Lang Chevrolet</u>: The expenses constituted approximately 0.9% of DEC's gross revenues in 2006 and 0.7% in 2007. We do agree with respondent, however, that expenses are not reasonable simply because they are small relative to a company's gross receipts. Nevertheless, in the light of the significant tangible and intangible benefits DEC obtained from the motocross racing activity, we estimate that the amounts DEC spent on the motocross racing activity during the years in issue were reasonable. Accordingly, petitioners are entitled to deduct all expenses related to the motocross racing activity reported for the years in issue, with the exception of those expenses related to the utility trailer. <u>See supra</u> note 8.

D.    <u>Section 179 Expense for the Motorhome</u>

Respondent also challenges petitioners' expense deductions for the motorhome under section 179, arguing that it was used primarily for lodging.

[*22] Petitioners argue that the motorhome was used primarily to transport Ben and his motorcycles to races and that they are entitled to the section 179 expense deductions. We agree with petitioners.

Section 179(a) generally allows a taxpayer to elect to treat the cost of section 179 property as a current expense in the year the property is placed in service, within certain dollar limitations. If the property is used for both business and other purposes, then the portion of the property's cost that is attributable to the business use is eligible for expensing under section 179 but only if more than 50% of the property's use is for business purposes. See sec. 1.179-1(d), Income Tax Regs.; see also Whalley v. Commissioner, T.C. Memo. 1996-533. Section 179 property is defined under subsection (d)(1), which excludes property described in section 50(b) from the definition. Sec. 179(d)(1) (flush language). Section 50(b) property includes "property which is used predominantly to furnish lodging or in connection with the furnishing of lodging." Sec. 50(b)(2). Such property, therefore, cannot be expensed under section 179. See secs. 50(b)(2), 179(d)(1).

Respondent's argument focuses on two facts: (1) Ben and his traveling companions slept on mattresses in the back of the motorhome and (2) DEC incurred almost no lodging expenses in connection with the motocross racing activity. Respondent downplays the fact that the motorhome was Ben's primary

**[\*23]** means of transporting himself and his motorcycles to races until DEC purchased the Mirage trailer. We also note that, unlike most motorhomes, petitioners' motorhome had a rear wall that folded down at the push of a button to make a ramp that Ben used to roll motorcycles up into the motorhome for transport and repairs. We find that the motorhome was not used predominantly for lodging. Accordingly, petitioners were entitled to deduct its cost under section 179.

III.    Accuracy-Related Penalties

Pursuant to section 6662(a) and (b)(1) and (2), a taxpayer may be liable for a penalty of 20% on the portion of an underpayment of tax due to: (1) negligence or disregard of rules or regulations or (2) a substantial understatement of income tax. "Negligence" is defined as any failure to make a reasonable attempt to comply with the provisions of the Code; this includes a failure to keep adequate books and records or to substantiate items properly. Sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs. Negligence has also been defined as the failure to exercise due care or the failure to do what a reasonable person would do under the circumstances. See Allen v. Commissioner, 92 T.C. 1, 12 (1989), aff'd, 925 F.2d 348, 353 (9th Cir. 1991); Neely v. Commissioner, 85 T.C. 934, 947 (1985). "Disregard" means any careless, reckless, or intentional disregard. Sec. 6662(c).

**[*24]** The Commissioner bears the initial burden of production. Sec. 7491(c). If the Commissioner satisfies his burden, the taxpayer then bears the ultimate burden of persuasion. Higbee v. Commissioner, 116 T.C. at 446-447. The accuracy-related penalty is not imposed with respect to any portion of the underpayment as to which the taxpayer shows that he or she acted with reasonable cause and in good faith. Sec. 6664(c)(1); Higbee v. Commissioner, 116 T.C. at 448.

Petitioners have prevailed on all issues in this case except with regard to the utility trailer and the conceded issues. As to those remaining issues, we find that respondent has met his burden of production.

Petitioners argue that they acted with reasonable cause and in good faith by relying on their C.P.A., Mr. Anderson. Reliance upon the advice of a tax professional may establish reasonable cause and good faith for the purpose of avoiding liability for the section 6662(a) penalty. See United States v. Boyle, 469 U.S. 241, 250 (1985). Whether reasonable cause exists when a taxpayer has relied on a tax professional to prepare a return must be determined on the basis of all of the facts and circumstances. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). The taxpayer claiming reliance on a tax professional must prove by a preponderance of evidence that he or she satisfies each prong of the following test: "(1) [t]he adviser was a

[*25] competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." Id. at 99.

Mr. Anderson was a C.P.A. Ms. Chacon, also a C.P.A., testified that she provided all documents and information necessary for Mr. Anderson to prepare petitioners' and DEC's tax returns. We find that, as to the utility trailer and the conceded issues, petitioners reasonably relied in good faith on Mr. Anderson's judgment. Accordingly, petitioners are not liable for any accuracy-related penalties.

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be entered

under Rule 155.