# United States Tax Court

T.C. Memo. 2023-18

JAMES WILLIAM AVERY,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 23237-18L.                    Filed February 21, 2023.

————

James William Avery, pro se.

*Jeri L. Acromite*, for respondent.


## MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, *Judge*:  In this collection due process (CDP) case petitioner seeks review pursuant to section 6330(d)(1)[1] of the determinations by the Internal Revenue Service (IRS or respondent) to uphold collection actions for tax years 2008–2013.  Petitioner was afforded a CDP hearing during which he attempted to challenge his underlying tax liabilities, including deficiencies, accuracy-related penalties, and additions to tax.  The settlement officers (SOs) refused to consider this challenge because the IRS had issued him notices of deficiency.  *See* § 6330(c)(2)(B).  Respondent concedes that petitioner did not receive those notices, that the SOs erred in declining to address his underlying

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, all regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all monetary amounts to the nearest dollar.

[*2] liability challenge, and that his liability challenge is properly before this Court.

We held a trial to consider that dispute. The principal question is whether the IRS erred in declining to allow deductions for $303,366 of advertising expenses that petitioner allegedly incurred during 2008–2013 in connection with his business as an attorney. Petitioner contends that these deductions correspond to expenses he incurred in conducting a racing car activity, which he says promoted his litigation practice. Respondent replies that petitioner failed to substantiate half of these expenses and that the racing-related costs he did substantiate were not "ordinary and necessary expenses paid or incurred . . . in carrying on [his] trade or business." *See* § 162(a). We agree with respondent on both counts and hold that petitioner is not entitled to deduct advertising costs in excess of those the IRS has allowed. Respondent has conceded the accuracy-related penalties for all years, but we find that petitioner is liable for certain additions to tax in amounts to be recalculated.

FINDINGS OF FACT

The following facts are derived from the pleadings, two Stipulations of Facts with attached Exhibits, and the documents and testimony admitted into evidence at trial. Petitioner resided in Colorado when his Petition was timely filed.

I.    *Petitioner's Legal Career*

Petitioner attended law school at the University of Denver and became licensed to practice law in 1982. During his career he has specialized in personal injury law, chiefly on behalf of plaintiffs. In the late 1980s he started his own law firm in Colorado. In 2003 he married a woman from Indiana, moved to Indiana, and became licensed to practice there. After that marriage fell apart in 2010, he moved back to Colorado where he resided for the remainder of the tax years in issue.

During 2008–2013 the focal point of petitioner's litigation work was Denver, where he maintained his "solo practice" office. Although living in Indiana during 2008–2010, he "wasn't generating much business there." Instead he "was going back to Denver to try cases and meet with clients" and did "all [his] business" in Colorado. He was also licensed to practice in New York, but his work there was limited to occasional consulting.

[*3] II.    *Petitioner's Racing-Related Activities*

Petitioner became involved in car-related activities in 2005 after he moved to Indiana.  He had no record as a lawyer in Indiana and began attending car shows, thinking this might be a way to meet potential clients.  He purchased a 30-year-old Ferrari for $75,000 and another "collector car."  He began attending automobile shows as a participant, displaying his collector cars.

As time went on petitioner found the car shows "a little bit boring" and became interested in car racing, to which he was introduced by his next-door neighbor in Indiana.  With his neighbor's assistance he purchased and rebuilt a 2000 Dodge Viper.  He prepared himself for road racing by attending a racing school in Indianapolis.

Because he "wasn't doing much in the way of law practice" in Indiana, petitioner devoted an increasing amount of time to car racing, which he greatly enjoyed.  He purchased a 2009 Dodge Viper for $102,500 and this became his preferred racing vehicle.  He noted that "there's a small area above the driver's window and the passenger window where you affix the name of the driver."  A decal for the Avery Law Firm, his "sponsor," appeared on the back tail of the car.  Petitioner expressed the belief that this signage functioned as "advertising" for his law practice.

Petitioner had a web page for his "Viper racing team." He explained that this was a "one-man operation" in which he served as the driver, mechanic, and sole team member.  One advantage of this arrangement was that he "not only got to associate with other drivers, being in drivers meetings," but also "got to associate with mechanics by going to mechanics meetings . . . as well as with the administrators of the events."  The web page included photographs and videos about his racing and was linked to the Facebook page for his law firm, which he later renamed "Denver Injury Law."  He expressed the belief that the link to "Viper racing team" might attract potential clients who were victims of automobile accidents.

Petitioner competed in road racing events at tracks in Indiana, Ohio, Wisconsin, Missouri, Pennsylvania, New York, Colorado, and other venues.  He won "local championships in the Midwestern region" and at one point "placed as high as Top 10 nationally."  After his marriage dissolved, he allegedly "didn't have the funds to race."  From that

[*4] point forward his 2009 Dodge Viper mostly "sat in the garage" in Denver.

Petitioner believed that being involved in car racing might enable him to meet lawyers, doctors, and other professionals who could help his career. Car racing, he said, was a good "conversation starter" with these individuals. But he could identify only two instances in which his car-related activity actually intersected with his law practice. Through one racing connection he met a Pizza Hut franchisee who had a dispute with a vendor; petitioner subsequently "consult[ed]" with that franchisee. Several years previously he had met a surgeon who later served as an expert witness in a personal injury case he tried in Denver. But he met that doctor at an Indiana car show, not at a racing event.

III.  *Petitioner's Tax Filings*

Petitioner failed to file returns for 2008 and 2009, and the IRS accordingly prepared substitutes for returns (SFRs) as authorized by section 6020(b). Petitioner's returns for 2008 and 2009 were supposed to have been prepared by his then-wife's grandfather, a certified public accountant (CPA). But that CPA had health problems and "got behind."

Petitioner hired a new CPA in 2011 after his wife filed for divorce. He testified that some of his financial records remained in the possession of his original CPA, and then of his wife's divorce lawyer. Petitioner claimed that these records were not returned to him until 2013.

On April 29, 2013, his new CPA prepared and filed delinquent returns for 2010 and 2011, reporting tax of $22,211 and zero, respectively. Petitioner secured an extension of time to file his 2012 return, *see* § 6081(a), and that return was timely filed on April 29, 2013, reporting zero tax due. Petitioner did not file a return for 2013 by the date prescribed therefor, and the IRS accordingly prepared for 2013 an SFR on the basis of third-party reports.

The divorce decree, which became final in 2013, required petitioner to pay his ex-wife $160,000, funds he allegedly had set aside to pay his past-due taxes. Petitioner deposited $160,000 into the registry of the divorce court in August 2013. That sum was paid to his ex-wife in December 2013.

On January 14, 2016, the IRS sent petitioner, by certified mail to his last known address, a notice of deficiency for 2008, 2009, and 2013. This notice was based on the SFRs and determined deficiencies of

**[\*5]** $3,752, $242,788, and $141,754, respectively, plus additions to tax for failure to timely file, failure to timely pay, and (for 2009 and 2013) failure to pay estimated tax. *See* §§ 6651(a)(1) and (2), 6654(a).

The IRS commenced an examination of petitioner's 2010–2012 returns. It disallowed for lack of substantiation all deductions claimed on his Schedules C, Profit or Loss From Business, and determined unreported gross receipts totaling $345,622 for 2011 and 2012. On January 14, 2016, the IRS issued petitioner, by certified mail to his last known address, a notice of deficiency for 2010–2012 that determined deficiencies of $81,687, $154,754, and $6,271, respectively. The notice determined late-filing additions to tax for 2010 and 2011, *see* § 6651(a)(1), and accuracy-related penalties for all three years, *see* § 6662(a). Respondent has conceded the penalties, for failure to secure timely supervisory approval. *See* § 6751(b)(1).

On March 29, 2016, petitioner prepared and submitted to the IRS delinquent returns for 2008, 2009, and 2013, and amended returns for 2010–2012. On these returns he reported Schedule C gross receipts, Schedule C advertising expenses, adjusted gross income (AGI), and tax liabilities as follows:

| Year | Gross Receipts | Advertising Expenses | AGI | Tax |
|------|----------------|----------------------|-----|-----|
| 2008 | $21,475 | $50,000 | ($77,449) | -0- |
| 2009 | 690,815 | 50,000 | 488,185 | $173,719 |
| 2010 | 72,778 | 60,000 | (85,801) | -0- |
| 2011 | 484,024 | 60,000 | 194,909 | 53,794 |
| 2012 | 51,577 | 65,000 | (104,513) | -0- |
| 2013 | 353,765 | 70,000 | 200,152 | 55,636 |

In his pretrial memorandum respondent stated that petitioner's delinquent and amended returns for 2008–2013 "were not processed" by the IRS. The trial evidence is consistent with that statement, except with respect to 2009. The certified IRS transcript of petitioner's 2009 Form 1040, U.S. Individual Income Tax Return, and his 2009 TXMODA account both show that, on May 15, 2017, the IRS abated $69,069 of tax for 2009. That is the difference between the tax determined for 2009 in the notice of deficiency ($242,788) and the tax reported on petitioner's delinquent return for that year ($173,719). We thus find that the IRS accepted petitioner's delinquent 2009 return for filing.

**[*6]** IV.  *IRS Collection Action*

The IRS assessed the tax determined in the notices of deficiency after petitioner failed to petition this Court within 90 days.  *See* § 6213(a).  When petitioner did not pay the assessed liabilities on notice and demand, the IRS commenced collection action.  On November 30, 2016, it issued him a Letter 1058, Notice of Intent to Levy and Your Right to a Hearing, for 2008–2013.  This notice reflected an aggregate unpaid liability of $986,794.  On December 15, 2016, the IRS issued petitioner a Letter 3172, Notice of Federal Tax Lien (NFTL) Filing and Your Right to a Hearing, for 2008, 2009, 2010, and 2013.

On December 30, 2016, petitioner timely requested a CDP hearing with respect to both notices.  His case was considered by several SOs during 2017 and 2018.  He sought to challenge his underlying tax liabilities for all six years, contending that his correct liabilities were shown on the delinquent and amended returns he had submitted in March 2016.

The SOs verified that the notices of deficiency for 2008–2013 had been sent to petitioner by certified mail to his last known address.  For that reason, the SOs concluded that he was prohibited from disputing his underlying tax liabilities.  *See* § 6330(c)(2)(B).  As a collection alternative petitioner made an offer-in-compromise (OIC), proposing to compromise his outstanding liabilities for $4,277.  He represented that he could afford no more than this, having lost his last three personal injury cases and having forfeited most of his assets to his ex-wife in the divorce.  Believing that petitioner's aggregate liabilities exceeded $980,000, the SOs viewed his offer with disfavor and rejected his OIC.

On October 22, 2018, the IRS issued petitioner notices of determination sustaining the NFTL filings and proposed levies for 2008–2013.  He timely petitioned this Court.  During trial preparation respondent determined that petitioner had not received any of the notices of deficiency, that he was entitled to challenge his underlying tax liabilities, and that the SOs had erred in declining to consider that challenge.

Respondent concluded that petitioner should be allowed the deductions claimed on his delinquent and amended returns for 2008–2013, except with respect to the advertising expenses reported on the Schedules C.  Before trial petitioner produced documents substantiating alleged advertising expenses of $66,366, of which $14,732 related to his racing car activity.  Respondent agrees that the difference between these

[*7] sums, or $51,634, should be allowed as legitimate advertising expenses, with the balance of the purported advertising expenses being disallowed, as follows:

| Year | Reported Advertising Expenses | Documented Amounts | Disallowed Racing Expenses | Allowed Expenses |
|---|---|---|---|---|
| 2008 | $50,000 | $2,973 | $1,850 | $1,123 |
| 2009 | 50,000 | 19,122 | 9,210 | 9,912 |
| 2010 | 60,000 | 15,028 | 2,181 | 12,847 |
| 2011 | 60,000 | 28,101 | 1,491 | 26,610 |
| 2012 | 65,000 | 727 | — | 727 |
| 2013 | 70,000 | 415 | — | 415 |
| **Total** | **$355,000** | **$66,366** | **$14,732** | **$51,634** |

In February 2022 we tried this case remotely via Zoomgov to consider three issues: (1) whether petitioner should be allowed Schedule C advertising expense deductions for 2008–2013 in excess of the $51,634 respondent concedes should be allowed; (2) whether petitioner is liable for additions to tax for failure to timely file, failure to timely pay, and failure to pay estimated tax; and (3) whether the SOs abused their discretion in considering petitioner's offer of a collection alternative. At the end of trial we directed the filing of seriatim post-trial briefs, with respondent's opening brief due May 9, 2022, and petitioner's answering brief due June 8, 2022. Respondent timely filed his brief. Petitioner twice moved for extensions of time to file his brief. We granted both motions, extending his time to September 19, 2022. He did not file a brief by that date or subsequently.[2]

## OPINION

I. *Standard of Review*

Sections 6320(c) and 6330(d)(1) do not prescribe the standard of review that this Court should apply in reviewing an IRS administrative determination in a CDP case. The general parameters for such review are marked out by our precedents. Where the validity of a taxpayer's underlying liability is properly at issue, we review the IRS determination de novo. *Goza v. Commissioner*, 114 T.C. 176, 181–82 (2000). Where the taxpayer's underlying liability is not properly at issue, we review the IRS decision for abuse of discretion only. *See id.* at 182. Abuse of discretion exists when a

---

[2] Because petitioner failed to file a brief as ordered by the Court, we could enter decision against him for that reason alone. *See* Rule 123(b). We will nevertheless consider the case on its merits.

8

[*8] determination is arbitrary, capricious, or without sound basis in fact or law. *See Murphy v. Commissioner*, 125 T.C. 301, 320 (2005), *aff'd*, 469 F.3d 27 (1st Cir. 2006).

A taxpayer may challenge his underlying liability at a CDP hearing if he did not receive a statutory notice of deficiency or did not otherwise have a prior opportunity to dispute his liability. § 6330(c)(2)(B). Although the IRS sent notices of deficiency to petitioner's last known address, respondent concedes that petitioner did not receive those notices. He was thus entitled to dispute his underlying liabilities at the CDP hearing, and his challenge is properly before this Court, subject to de novo review.

II.     *Underlying Tax Liabilities*

A.     *Advertising Expense Deductions*

Respondent agrees that petitioner should be allowed the expense deductions claimed on his delinquent and amended returns, except for the advertising expenses reported on his Schedules C. Deductions are a matter of legislative grace, and taxpayers bear the burden of proving their entitlement to any deduction claimed. Rule 142(a); *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). A taxpayer must show that he has met all requirements for each deduction and keep books or records that substantiate the expenses underlying it. § 6001; *Roberts v. Commissioner*, 62 T.C. 834, 836 (1974). Failure to keep and present such records counts heavily against a taxpayer's attempted proof. *Rogers v. Commissioner*, T.C. Memo. 2014-141, 108 T.C.M. (CCH) 39, 43.

On his delinquent and amended returns for 2008–2013 petitioner claimed in connection with his Schedule C business $355,000 of deductions for advertising expenses, all reported in round-dollar amounts. Respondent concedes that petitioner has substantiated $51,634 of genuine advertising costs. Petitioner urges that the $303,366 balance should also be allowed, contending that it corresponds to expenses he incurred in conducting a racing car activity, which he says promoted his litigation practice.

Before trial petitioner submitted documents to respondent that substantiated $14,732 of car racing expenses. At trial petitioner submitted documents reflecting $121,607 of additional car-related expenses. These consist of the purchase price for his 2009 Dodge Viper ($102,500) plus payments during 2009–2012 for parts and labor in connection with that vehicle ($19,107). We will assume arguendo that some

**[\*9]** or all of the capital cost of the Dodge Viper was potentially recoverable during 2009–2013 as depreciation expenses.  Even with that allowance, petitioner has failed to provide any substantiation whatsoever for $167,027 of his claimed car racing expenses ($303,366 − [$14,732 + $121,607] = $167,027), and we hold that respondent has properly declined to allow that portion.

With respect to the costs petitioner did substantiate, section 162(a) allows the deduction of "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business."  A taxpayer must show, not only that he incurred the item in question, but also that it was an ordinary and necessary expense of the particular business in which he was engaged.  *Commissioner v. Lincoln Sav. & Loan Ass'n*, 403 U.S. 345, 352 (1971).  An expense is "ordinary" if "the transaction which gives rise to it [is] of common or frequent occurrence in the type of business involved."  *Deputy v. du Pont*, 308 U.S. 488, 495 (1940); *Welch v. Helvering*, 290 U.S. 111, 113–14 (1933).  A necessary expense is one that is "appropriate and helpful" in carrying on the taxpayer's profit-seeking activity.  *Welch v. Helvering*, 290 U.S. at 113; *Heineman v. Commissioner*, 82 T.C. 538, 543 (1984).

In determining whether an expense is "ordinary and necessary" within the meaning of section 162(a), the courts have focused on the taxpayer's primary motive for incurring the expense and on whether there is a reasonably proximate relationship between the expense and the taxpayer's occupation.  *See, e.g.*, *O'Connor v. Commissioner*, 653 F. App'x 633, 638 (10th Cir. 2016), *aff'g on this issue* T.C. Memo. 2015-155; *Walliser v. Commissioner*, 72 T.C. 433, 437–38 (1979); *Henry v. Commissioner,* 36 T.C. 879, 884 (1961); *Berry v. Commissioner*, T.C. Memo. 2021-42, 121 T.C.M. (CCH) 1292, 1295.  If an expenditure is primarily motivated by personal considerations, no deduction is allowed.  *Berry*, 121 T.C.M. (CCH) at 1295 (citing *Henry*, 36 T.C. at 884).

We agree with respondent that petitioner's racing-related costs were not ordinary and necessary expenses of his business as an attorney.  It is neither "necessary" nor "common" for attorneys to incur such costs.  Petitioner greatly enjoyed car racing, which he found more exciting than his previous hobby of acquiring collector cars and participating in car shows.  But we find that both activities were hobbies.  No deduction is allowed for personal expenses of this kind.  *See* § 262(a) (disallowing deductions for "personal, living, or family expenses").

[*10]  During the tax years at issue petitioner's litigation practice was conducted almost exclusively in Colorado, where he met with clients and did "all [his] business."  But most of his racing activity occurred during 2008–2010, when he lived in Indiana.  He raced on tracks in Indiana, elsewhere in the Midwest, and on the East Coast.  He did not convince us that racing at these venues had any synergy with his Denver-based litigation practice.

If petitioner genuinely viewed car racing as a form of advertising, one might expect that he would have ramped up this activity (or at least maintained it) when he returned in late 2010 to Colorado, the main market for his legal services.  But he acknowledged that his 2009 Dodge Viper mostly "sat in the garage" after he returned to Denver.  In his pretrial submissions he documented only $1,491 of racing-related expenses in 2011 and zero expenses during 2012 and 2013.  And the documents he produced at trial showed only $546 of car-related expenses for 2012 and zero for 2013.

Even if petitioner had raced in the relevant market, we would not find his expenses to be legitimate advertising expenses.  His name and a decal for his law firm appeared in relatively small print on his Dodge Viper.  This form of "signage" is at the opposite end of the spectrum from (say) a billboard or a newspaper ad.  Indeed, every driver's name typically appeared on his or her racing car.  Petitioner has offered no reason why he should have a stronger claim to an advertising expense than thousands of other drivers.

Petitioner allegedly believed that being involved in car racing would enable him to meet lawyers, doctors, and other professionals who could help his career.  But he could identify only one instance—involving a Pizza Hut franchisee—in which his racing activity actually intersected with his law practice.  And that relationship did not lead to any personal injury litigation, but only to "consultation" about a vendor dispute.

Petitioner testified that he found car racing to be a good "conversation starter" when meeting with other professionals.  But innumerable sports and hobbies could serve the same function—a pastime that a person might enjoy and share with other people, possibly leading to eventual business relationships.  That possibility does not convert the costs of pursuing a hobby into deductible advertising expenses.  We accordingly find that petitioner has failed to carry his burden of proving

**[\*11]** that he is entitled to deduct advertising expenses in excess of $51,634, the amount respondent has conceded for 2008–2013.[3]

### B. *Additions to Tax*

#### 1. *Failure to Timely File*

Section 6651(a)(1) provides for an addition to tax of 5% of the tax required to be shown on the return for each month or fraction thereof for which there is a failure to file the return, not to exceed 25% in total. Respondent determined additions to tax under this provision for 2008–2011 and 2013. An individual taxpayer is generally required to file a return for a given year by April 15 of the following year, *see* § 6072(a), or by October 15 if an extension was secured, *see* § 6081(a); *see also* § 7503 (extending the deadline until the following business day if the due date falls on a weekend or a legal holiday).

Respondent has the burden of production on this issue. *See* § 7491(c). Petitioner filed his 2010 and 2011 returns on April 29, 2013, more than a year late. He did not submit returns for 2008, 2009, and 2013 until March 2016. Respondent has thus satisfied his burden to show that petitioner did not file returns timely for these five years.

The addition to tax for late filing does not apply if the taxpayer shows that his failure was "due to reasonable cause and not due to willful neglect." § 6651(a)(1). "If the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is due to a reasonable cause." Treas. Reg. § 301.6651-1(c)(1). The taxpayer can show that he did not act with "willful neglect" if he can "prove that the late filing did not result from

---

[3] This case is distinguishable from prior cases—e.g., involving car dealerships, construction companies, and companies engaged in the sale and leasing of aircraft—in which we found car or motorcycle racing expenses to be deductible advertising costs. *See, e.g., Evans v. Commissioner,* T.C. Memo. 2014-237, 108 T.C.M. (CCH) 554; *Ciaravella v. Commissioner*, T.C. Memo. 1998-31, 75 T.C.M. (CCH) 1635; *Boomershine v. Commissioner*, T.C. Memo. 1987-384; *Lang Chevrolet Co. v. Commissioner*, T.C. Memo. 1967-212. In several of these cases, the fact that unrelated sponsors compensated the driver for displaying their logos confirmed the seriousness of the racing activity. *See Evans*, 108 T.C.M. (CCH) at 557; *Ciaravella*, 75 T.C.M. (CCH) at 1638. In each of those cases we found as a fact that there existed "a proximate relationship between the expenditure and the business of the taxpayer." *See, e.g., Evans*, 108 T.C.M. (CCH) at 557; *Ciaravella*, 75 T.C.M. (CCH) at 1640. Petitioner has not carried his burden of proving any such "proximate relationship" here. And the evidence conclusively showed that he engaged in car racing primarily for personal enjoyment, not to advertise his legal services.

**[\*12]** a 'conscious, intentional failure or reckless indifference.'" *Niedringhaus v. Commissioner*, 99 T.C. 202, 221 (1992) (quoting *United States v. Boyle*, 469 U.S. 241, 245–46 (1985)). The burden of showing reasonable cause under section 6651(a)(1) is upon petitioner. *See Higbee v. Commissioner*, 116 T.C. 438, 447–48 (2001).

Petitioner offered no excuse for filing his 2013 return two years late. He testified that his then-wife's grandfather, who was supposed to have prepared the 2008 and 2009 returns, had health problems and "got behind." But as the Supreme Court has held, taxpayers have a personal, nondelegable duty to file tax returns on time. *See Boyle*, 469 U.S. at 249 ("Congress intended to place upon the taxpayer an obligation to ascertain the statutory deadline and then to meet that deadline . . . ."). Petitioner cannot seek shelter in inattention or neglect on the part of his CPA. *See id.* at 252; *Shaw v. Commissioner*, T.C. Memo. 2013-170, 106 T.C.M. (CCH) 54, 59 (ruling that reliance on a tax professional "cannot constitute 'reasonable cause' for a late filing" when the return's due date "is obvious to the taxpayer"), *aff'd*, 623 F. App'x 467 (9th Cir. 2015).

Petitioner contends that his 2010 and 2011 returns were filed late because his financial records were in the possession of his original CPA, and then of his ex-wife's divorce lawyer, until sometime in 2013. We do not find this excuse credible. Virtually all of his income consisted of receipts from his law practice. It is hard to believe that he did not have enough knowledge of what those receipts were to enable him to file a tax return. In any event, it is well settled that taxpayers must file timely income tax returns on the basis of the best information available to them at the time, and then file an amended return if necessary. *Estate of Vriniotis v. Commissioner*, 79 T.C. 298, 311 (1982). We accordingly conclude that he is liable for the late-filing addition to tax for all five years.

2.     *Failure to Timely Pay*

Section 6651(a)(2) provides for an addition to tax when a taxpayer fails "to pay the amount shown as tax on any return . . . on or before the date prescribed for payment of such tax." To meet his burden of production for this addition to tax, respondent must establish that the unpaid amount was "shown as tax on [a] return." § 6651(a)(2); *see Wheeler v. Commissioner*, 127 T.C. 200, 208–10 (2006), *aff'd*, 521 F.3d 1289 (10th Cir. 2008). An SFR that meets the requirements of section 6020(b) may be treated as the "return" filed by the taxpayer for this purpose. *See* § 6651(g)(2).

**[\*13]** The IRS determined late-payment additions to tax for 2008, 2009, and 2013, the years for which it issued notices of deficiency after receiving no return from petitioner. Although these notices were evidently based on SFRs, respondent did not introduce copies of the SFRs into evidence at trial. To satisfy his burden of production, respondent relies instead on the delinquent returns petitioner submitted to the IRS in March 2016. However, the evidence establishes that only one of these returns—the delinquent return for 2009—was actually accepted by the IRS for filing. Petitioner's delinquent return for 2009 showed tax due of $173,719, and he does not dispute that he failed to pay the tax shown as due on that return. We accordingly conclude that respondent has met his burden of production for 2009, but not for 2008 or 2013.

The addition to tax for failure to pay does not apply if the taxpayer shows that his failure was "due to reasonable cause and not due to willful neglect." § 6651(a)(2); *see Higbee*, 116 T.C. at 447. To prove reasonable cause the taxpayer must show that he exercised ordinary business care and prudence in providing for payment of his tax liability but nevertheless was either unable to pay the tax or would have suffered undue hardship if he had paid the tax on the due date. Treas. Reg. § 301.6651-1(c)(1). The determination of whether the taxpayer had reasonable cause under section 6651(a)(2) is similar to the analysis under section 6651(a)(1), except that undue financial hardship may be a defense in the former case. *See Russell v. Commissioner*, T.C. Memo. 2011-81, 101 T.C.M. (CCH) 1363, 1367 n.9. To establish undue hardship, the taxpayer must show that making the tax payment on time would have created "the risk of a substantial financial loss." *Merriam v. Commissioner*, T.C. Memo. 1995-432, 70 T.C.M. (CCH) 627, 636, *aff'd without published opinion*, 107 F.3d 877 (9th Cir. 1997).

In seeking to establish reasonable cause, petitioner contends that he had set aside $160,000 to pay his past-due taxes, but that he was required to pay this sum to his ex-wife in December 2013 when his divorce became final. The failure to pay for 2009, however, occurred on April 15, 2010, "the date prescribed for payment" of his 2009 tax. *See* § 6651(a)(2); *Estate of Hartsell v. Commissioner*, T.C. Memo. 2004-211, 88 T.C.M. (CCH) 267, 269 (ruling that "reasonable cause" is a "one-time test to be passed or failed at the payment due date"); *Merriam*, 70 T.C.M. (CCH) at 636.

Petitioner did not pay $160,000 into the registry of the divorce court until August 2013. He supplied no evidence that these funds were unavailable in April 2010 for payment of his tax. His AGI for 2009,

**[*14]** moreover, was $488,185.  During that year he evidently felt sufficiently confident in his financial position to purchase a racing car for $102,500. All in all, he has not convinced us that paying his 2009 tax on the due date would have created "the risk of a substantial financial loss." *Merriam*, 70 T.C.M. (CCH) at 636.  We accordingly find that he is liable for a late-payment addition to tax for 2009.

### 3.     *Failure to Pay Estimated Tax*

Section 6654(a) imposes an addition to tax on an individual who underpays his estimated tax.  This addition to tax is calculated with reference to four required installment payments of the taxpayer's estimated tax liability.  § 6654(c) and (d).  However, no addition to tax is imposed if the taxpayer is U.S. citizen (as petitioner is) who "did not have any liability for tax for the preceding [12-month] taxable year." § 6654(e)(2).

The IRS determined additions to tax under section 6654 for 2009 and 2013.  Petitioner's delinquent returns for 2008 and 2012—prepared on the assumption that he was entitled to Schedule C advertising deductions of $50,000 and $65,000 respectively—showed zero tax due.  Respondent represents that he will recalculate or concede petitioner's liabilities for the section 6654 additions to tax depending on the amount of his 2008 and 2012 tax liabilities, as redetermined consistently with this Opinion.

## III.     *Abuse of Discretion*

In deciding whether the SOs abused their discretion we consider whether they (1) properly verified that the requirements of applicable law or administrative procedure were met, (2) considered relevant issues petitioner raised, and (3) considered "whether any proposed collection action balances the need for the efficient collection of taxes with the legitimate concern of [petitioner] that any collection action be no more intrusive than necessary."  *See* §§ 6330(c)(3), 6320(c).

As a collection alternative petitioner proposed an OIC offering to compromise his outstanding liabilities for $4,277.  Because the SOs declined to permit an underlying liability challenge, petitioner did not have an opportunity to present collection alternatives keyed to what his actual tax liabilities were.  Respondent accordingly requests that, after deciding the liability issue, we remand this case to the IRS Independent Office of Appeals for a supplemental hearing to consider "offers of collection alternatives."  *See* § 6330(c)(2)(A)(iii).  We will grant that request.

**[\*15]**  To implement the foregoing,

> *An appropriate order will be issued.*